**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Merry Gentleman, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. |
| v. | ) |
| | ) |
| George and Leona Productions, Inc., | ) |
| and Michael Keaton, | ) |
| | ) |
| Defendants. | ) |

**COMPLAINT**

Merry Gentleman, LLC, by its counsel, TANNER & LEHMAN LLC, for its complaint, alleges as follows:

1. Merry Gentleman, LLC produced a motion picture known as "The Merry Gentleman," for which Michael Keaton, through George and Leona Productions, Inc. (collectively "Keaton"), agreed to act and direct. Keaton violated the terms of his directorial contract in many material respects, which led to substantial delays and increased expenses in the completion and release of the movie, and caused substantial financial loss to the plaintiff.

2. Merry Gentleman, LLC is a limited liability company organized under the laws of the State of Illinois, and whose members are citizens of Illinois.

3. George and Leona Productions, Inc. (also known as George and Leona Productions Inc. f/s/o [for the services of] Michael Keaton) is a corporation organized under the laws of the State of California, and with its principal place of business in California.

1

4. Michael Keaton, on information and belief, is a citizen of Montana.

5. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, in that the parties are of diverse citizenship, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (3), in that a substantial portion of the events or omissions complained of occurred within this judicial district, and in that defendants are subject to this Court's personal jurisdiction.

7. Merry Gentleman, LLC was created to be the production company for a motion picture known as "The Merry Gentleman," to be filmed in Chicago, based upon a screenplay by Chicago-based Ron Lazzeretti.

8. Defendant Michael Keaton, through George and Leona Productions, Inc. (an entity known as a "lender" or "loan-out company," which is formed for the purpose of providing the services of an artist to a production company), initially was hired to act as the lead male role of "Frank" in "The Merry Gentleman," along with co-star Kelly Macdonald as the female lead. In the story told by the film, Frank (Keaton's character) is a professional killer who develops an unlikely relationship with Macdonald's character.

9. By the time "The Merry Gentleman" was ready for production, Keaton was a well-established movie and television actor. Kelly Macdonald had appeared in "No Country for Old Men," a film that was released in November 2007 and won four Academy Awards, and for which Macdonald was nominated for a "best supporting actress" award by the British Academy of Film and Television Arts (BAFTA).

2

10. As production of "The Merry Gentleman" approached, Ron Lazzeretti, who was not only the screenwriter but had also been chosen to direct the film, took ill, which required the hiring of a replacement director.

11. As Merry Gentleman, LLC began taking steps to locate and hire a replacement director, Michael Keaton informed Merry Gentleman, LLC that he would like to direct the film himself.

12. Accordingly, in 2007, Merry Gentleman LLC entered into two service agreements, one for acting and one for directing, with George and Leona Productions, Inc. f/s/o Michael Keaton. The terms of the acting service agreement are attached hereto as Exhibit A; the terms of the directing services agreement are attached hereto as Exhibit B.

13. Keaton himself agreed to the terms of the directing services agreement, and personally agreed, in order to induce Merry Gentleman LLC to enter into that agreement, to be bound by those terms.

14. In a separate Certificate of Employment executed in or about March 2007 (and attached hereto as Exhibit C), George and Leona Productions, Inc. and Keaton agreed that they and Merry Gentleman LLC had "concluded the material terms of an acting services and directing services agreement . . . ."

15. Shooting on the movie took place in Chicago during March and April 2007.

16. One of a director's duties during production (shooting) is to review the daily film footage with an editor. This permits shooting to proceed most efficiently, and saves time in the post-production editing phase.

17. Keaton, despite being offered the services of several qualified editors (who would have worked on the project both during production and post-production), refused to select an editor during production, and did not perform the director's duties with regard to daily footage.

18. Under the terms of his directing contract, Keaton was to deliver a "first cut" of the movie, but other business and creative decisions, explicitly including the "final cut" of the movie, belonged to plaintiff, as the producer.

19. After the shooting on the movie was completed in Chicago, plaintiff, at its own expense and as an accommodation to Keaton, set up editing facilities in Santa Monica, California, so that Keaton, as director, could participate in the editing process.

20. Once the editing facilities were in place in California, Keaton announced that he was leaving California to go fly-fishing near Bozeman, Montana for a period of weeks.

21. Again at plaintiff's expense, and again as an accommodation to Keaton, plaintiff arranged to have editing facilities set up in Bozeman, and for an assistant editor to travel to Bozeman to work with Keaton.

22. While in Montana, Keaton visited the editing facility from time to time, but did not fulfill the duties of a director. Instead, the director's artistic duties — such as selecting and editing together the best scenes — were left to subordinates without direction from Keaton.

23. When Keaton returned to California, the editing process continued in Santa Monica. Keaton's failures, both during and post-production, to perform the role of a director caused the first cut of the film to be behind schedule, and substantially increased the costs of production.

24. Keaton finally submitted a "first cut" of the film to plaintiff in or about early August 2007.

25. At a dinner with Keaton and members of plaintiff in California on August 2, 2007, Keaton acknowledged that his "first cut" was unsatisfactory, stating words to the effect that he was convinced there was "a good movie in there somewhere," which he asked for more time to complete.

26. Keaton and members and staff of plaintiff viewed Keaton's "first cut" on August 3, 2007 in California, and plaintiff concluded (in agreement with what Keaton himself had acknowledged the night before) that it was unsatisfactory.

27. Plaintiff informed Keaton's attorney and agent that there were major problems with Keaton's work. They proposed that plaintiff give Keaton "another shot." They proposed that Keaton be given an opportunity to make another cut of the film, while plaintiff proceeded with preparing its own cut, after which plaintiff could view both versions and choose the one it preferred.

28. Accordingly, plaintiff, in conjunction with the writer of the screenplay (and originally designated director) Ron Lazzeretti and others, re-edited the film in Chicago. The resulting cut of the film is known as the "Chicago cut."

29. At the same time as plaintiff was engaging in the preparation of the Chicago cut, plaintiff also agreed, as an accommodation to Keaton, to permit Keaton to complete a second director's cut.

30. As soon as Keaton learned that a version of the film was being re-edited in Chicago, he cut off virtually all communications with plaintiff.

31. Upon completion of the Chicago cut and Keaton's second cut in October 2007, both versions of the film were screened by plaintiff, which concluded that although Keaton's second cut was an improvement over the first, the Chicago cut was better, including being better positioned for critical and commercial success. Plaintiff's concerns about Keaton's second cut included the conclusion that the musical score (also known as a film's background or incidental music) — for which Keaton had hired his son, who had no relevant professional experience — was simply not good, and did not enhance the film. Under the terms of the parties' agreements, these determinations — *i.e.,* how to proceed following the director's cut — were in the discretion of plaintiff, as producer.

32. In the fall of 2007, plaintiff submitted the Chicago cut of "The Merry Gentleman" to the director of the Sundance Film Festival, the largest and most prestigious independent film festival in the United States.

33. In November 2007, "The Merry Gentleman" was selected to have its premiere at the 2008 Sundance Film Festival, to be shown in the Eccles Theatre (the largest theater at the Festival). This determination to premiere the film at Sundance was made based upon Sundance's evaluation of the Chicago cut.

34. Having a film selected to premiere at Sundance, particularly in the Eccles Theatre, is a highly coveted opportunity often leading to substantial commercial success. Other films selected to premiere at Sundance in recent years include "(500) Days of Summer" (2009, U.S. box office $32 million); "Adventureland" (2009, U.S. box office $16 million); "Black Snake Moan" (2007, U.S. box office $9 million); "Little Miss Sunshine" (2006, U.S. box office $60

million); "Thank You for Smoking" (2006, U.S. box office $25 million); "Napoleon Dynamite" (2004, U.S. box office $45 million); and "Garden State" (2004, U.S. box office $27 million).

35. "In Bruges" — another offbeat film about professional killers, which premiered at Sundance 2008 the night before "The Merry Gentleman" — had U.S. box office of nearly $8 million, and foreign box office of $25.6 million.

36. The commercial success of films premiered at Sundance include many with budgets that are (by Hollywood standards) modest. "(500) Days of Summer" had a budget of approximately $7.5 million; "Little Miss Sunshine" $8 million; "Thank You for Smoking" $6.5 million; "Napoleon Dynamite" $400,000; and "Garden State" $2.5 million. "The Merry Gentleman" had a budget of approximately $5 million.

37. Upon learning that the film had been selected for its premiere at Sundance, Keaton and his representatives — without notifying plaintiff — approached Sundance director Geoffrey Gilmore and his representatives, informed them that his (Keaton's) "cut" of the film was not the version that had been submitted to Sundance; and informed Gilmore that unless Sundance agreed to screen Keaton's cut at the festival, Keaton would refuse to appear at the festival.

38. Keaton's actions with regard to Sundance violated the terms of his director services agreement in multiple ways. Section 12 of the Terms and Conditions of that agreement provided that plaintiff "shall have all business and artistic controls over the promotion and publicity relating to the Picture . . ." and that Keaton "shall not in any communication (whether written or oral) to any third party make any reference to Company [Merry Gentleman LLC], the Screenplay, the Picture, this Agreement or any related matters" with minor exceptions not

applicable here. It also provided that plaintiff "shall have the right to require you [Keaton] to render reasonable publicity and promotional services, subject to your reasonable approval, and provided that you are professionally available, subject only to your then professional entertainment contractual commitments to third parties."

39. By seizing artistic control over the promotion of the film to Sundance; by making direct communications regarding the film to Sundance personnel; and by refusing to attend Sundance to promote the film unless his cut was shown at the festival, Keaton breached the express terms of his directing contract.

40. Because Sundance officials wished to have Keaton present at the premiere (both because of his name recognition and because Sundance is known as a director's festival), Sundance informed Merry Gentleman LLC that unless Keaton would appear at the festival, Sundance would withdraw the opportunity to show the film at the festival.

41. By the time the film was first selected to have its premiere at Sundance, Merry Gentleman LLC had already invested more than $4 million in the film's production.

42. By wrongfully holding the film's Sundance opportunity hostage, Keaton left Merry Gentleman LLC with no choice but to enter into a Confidential Settlement Agreement and Release ("Settlement and Release") with George and Leona Productions, Inc. and Keaton, in which Merry Gentleman LLC agreed to permit Keaton's "cut" of the film to be shown at Sundance.

43. While the Settlement and Release, attached hereto as Exhibit D, purports to recite consideration flowing to Merry Gentleman, LLC in exchange for the agreement to permit

Keaton's "cut" to be shown at Sundance, there was in fact no consideration flowing to Merry Gentleman LLC.

44. In the Settlement and Release, Keaton offered nothing more than to perform his pre-existing contractual duties, and even in this regard — Keaton's undertaking "to comply with [his] obligations under the Services Agreements" — Keaton failed to meet his obligations, as set forth in greater detail below.

45. The Settlement and Release is invalid as lacking in consideration, and as being the product of duress. Moreover, Keaton's breach of his renewed (and pre-existing) obligation to comply with the Services Agreements constituted a material breach of the Settlement and Release, excusing any performance obligations of plaintiff pursuant to the Settlement and Release.

46. After the execution of the Settlement and Release, Keaton, as director, continued to have duties to prepare the film for screening to an audience (both for the Sundance premiere and subsequent preparation for commercial release), including work on cleaning up the cut; sound correction; color correction; and music selection.

47. For all of these duties, Keaton was absent and/or non-responsive. Merry Gentleman LLC was forced to endure numerous delays, and to have Keaton's directorial duties performed by other personnel, both before and after the Sundance premiere.

48. Following the execution of the Settlement and Release, Keaton selected music (previously existing popular music to be licensed for use in the film, as distinct from the score) for the Sundance screening that was well over the film's music budget, notwithstanding that Keaton was aware of and bound to honor that budget. When Keaton was informed that the music

9

he had chosen was not within budget, he simply insisted that his selections were "in," and refused to discuss the matter further. While plaintiff was able to secure the rights to that music for purposes of the Sundance screening through acquisition of a one-time "festival" license, the use of that same music in the theatrical release would have resulted in a budget overrun of some $400,000.

49. "The Merry Gentleman" was premiered, essentially in the form of the second "Keaton cut," at Sundance at the Eccles Theatre, on January 18, 2008. On the eve of the Sundance festival, USA Today identified, among the more than 125 movies being showcased at the festival, 10 films "that stand out" including "The Merry Gentleman."

50. Key events in "The Merry Gentleman" are set during Christmastime — the film's "trailer" begins with a key scene where Keaton's and Macdonald's characters meet for the first time while she is struggling to carry her Christmas tree into her apartment building — and with reasonable efforts by Keaton, as director, to work toward the film's completion after the January 2008 Sundance screening, the film would have been ready for release in time for the 2008 Christmas season (*i.e.,* a release in October or November 2008).

51. Instead, because of Keaton's continued refusal to perform his directorial duties through approximately March of 2009, the film could not be commercially released until May of 2009. This delay resulted in substantial increases in the costs of production, and resulted in a "Christmas" movie being released in May. As a further result of the delay arising out of Keaton's breaches, the film was released after a substantial deterioration in the market for post-theatrical showing revenues (*e.g.,* DVD sales).

52. Indeed, both before and after Sundance, Keaton engaged in a pattern of refusing to have any further dealings with anyone on the production team with whom he had the slightest disagreement, including the film's executive producer, Paul Duggan; its producers, Tom Bastounes, Steven A. Jones and Christina Varotsis; the music supervisor, Tracy McKnight; the post-production supervisor, Sharon Zurek; the person in charge of the musical score, Ed Shearmur; the writer, Ron Lazzeretti; and the agent hired by plaintiff to market the film, Peter Goldwyn. These refusals to cooperate with key people involved in the film's production and marketing constituted breaches of Keaton's duties as director, and created substantial impediments to the film's completion and marketing.

53. The movie, as released (based upon Keaton's second cut and numerous changes made by plaintiff), received substantial critical praise. Roger Ebert called the film "original, absorbing and curiously moving in ways that are far from expected." The New York Times' Manohla Dargis called it "[a]n austere, nearly perfect character study of two mismatched yet ideally matched souls." David Letterman said on his *Late Night* talk show, "What a tremendous film . . . . I loved it."

54. Nonetheless, as a result of the delay in the film's release caused by Keaton's failure to perform his post-production directorial duties, as well as Keaton's other breaches, the film's U.S. box office was less than $350,000.

55. Keaton exacerbated the problems he had already caused by failing to meet his obligations to assist in promoting the films, despite his high-end travel and accommodations being paid for. For example, during a Keaton appearance on ABC's Good Morning America on April 23, 2009 — ostensibly to promote the film on the eve of its release — when host Robin

Roberts asked if she was describing the film's plot correctly, Keaton responded that he "ha[dn't] even seen it for awhile . . . ." This was both an admission of Keaton's failure to fulfill his directorial duties, and an independent failure of Keaton's obligation to provide "reasonable publicity and promotional services."

56. Roberts proceeded to show a clip from the film, and when the cameras returned to the studio, Keaton had inexplicably donned sunglasses. Roberts noted that during the screening of the clip, Keaton was "looking at everything but" the clip; Keaton claimed that he wasn't sure where he was supposed to look to see it, and had instead been "looking at the folks over there."

57. In sum, Keaton consistently, from 2007 through 2009, breached his contractual obligations, which substantially added to the cost of production of the film, substantially delayed the film's release, and impaired the film's commercial success.

## COUNT I — BREACH OF CONTRACT
## AGAINST GEORGE AND LEONA PRODUCTIONS, INC. AND KEATON

58. Plaintiff reasserts and realleges paragraphs 1 through 57 of this Complaint as if fully set forth herein.

59. Plaintiff had a valid and binding director's contract with each of George and Leona Productions, Inc. and Keaton.

60. Plaintiff fulfilled all of its obligations under its contracts as producer of the film "The Merry Gentleman."

61. Keaton, on his own behalf and as the artist whose services were contracted for with George and Leona Productions, Inc., violated his duties under the director's contract in numerous and material ways.

Case: 1:13-cv-02690 Document #: 1 Filed: 04/10/13 Page 13 of 13 PageID #:13

62. The breaches by Keaton and George and Leona Productions, Inc. caused substantial damage to Merry Gentleman, LLC, including both increased costs and lost commercial opportunities for the film "The Merry Gentleman."

WHEREFORE, plaintiff seeks judgment in its favor, and against Keaton and George and Leona Productions, Inc., for damages to be ascertained at trial.

PLAINTIFF DEMANDS TRIAL BY JURY.

                               s/ Matthew D. Tanner
                               Counsel for plaintiff

Matthew D. Tanner (ARDC 6202508)
Richard H. Lehman
TANNER & LEHMAN LLC
53 West Jackson Boulevard, Suite 400
Chicago, Illinois 60604
312.588.1970

13