UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MERRY GENTLEMAN, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 13 C 2690 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| GEORGE AND LEONA PRODUCTIONS, INC., and MICHAEL KEATON, | ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Merry Gentleman, LLC, alleges that Michael Keaton and his loan-out company, George and Leona Productions, Inc., whose presence in this suit will be ignored for ease of exposition, breached their obligations under the parties' contract for directing services for the motion picture, *The Merry Gentleman*. Doc. 1. Keaton has moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), or alternatively, to strike ¶¶ 15-45 from the complaint under Rule 12(f). Doc. 10. The motion is denied.

**Background**

In considering Keaton's motion, the court assumes the truth of the complaint's factual allegations, though not its legal conclusions. *See Munson v. Gaetz*, 673 F.3d 630, 632 (7th Cir. 2012). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Merry Gentleman's brief opposing dismissal, so long as those facts "are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). To the extent an exhibit attached to or referenced by the complaint contradicts the complaint's allegations, the exhibit takes precedence. *See Forrest v. Universal*

*Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007). The following facts are set forth as favorably to Merry Gentleman as permitted by the complaint and the other materials that must be considered on a Rule 12(b)(6) motion.

Merry Gentleman, a production company, produced *The Merry Gentleman*, a motion picture that Michael Keaton directed and in which he starred. Doc. 1 at ¶¶ 1-2. On February 1, 2007, Keaton entered into both an acting services agreement and a directing services agreement with Merry Gentleman. *Id.* at ¶¶ 8, 12; *see* Docs. 1-1, 1-2, 1-3. This case does not concern the acting services agreement. The directing services agreement is governed by Illinois law. Doc. 1-2 at 15, ¶ 17.

One of Keaton's responsibilities under the directing services agreement was to deliver a "first cut" of the film. Doc. 1 at ¶ 18. During the film's shooting in Chicago in March and April 2007, Keaton declined the services of an editor who could review the daily film footage with him. *Id.* at ¶¶ 15, 17. Nor did Keaton use the editing facilities that Merry Gentleman had set up for him in Santa Monica, California, after shooting concluded, electing instead to go fly-fishing for a period of weeks in Bozeman, Montana. *Id.* at ¶¶ 19-20. Merry Gentleman responded by setting up editing facilities in Bozeman, which Keaton used periodically, leaving the selection and editing together of the "best scenes" to subordinates. *Id.* at ¶ 21-22.

Keaton submitted his first cut of the film to Merry Gentleman behind schedule, in August 2007. *Id.* at ¶¶ 23-24. Merry Gentleman found the first cut "unsatisfactory," a sentiment with which Keaton agreed. *Id.* at ¶ 26. At Keaton's request, Merry Gentleman allowed him to make a second cut; at the same time, and without Keaton's knowledge, Merry Gentleman worked to prepare its own cut with the intention of ultimately proceeding with whichever turned out to be

the better version. *Id*. at ¶¶ 27-30. Ultimately, Merry Gentleman chose to submit its own cut, rather than Keaton's second cut, to the Sundance Film Festival. *Id*. at ¶¶ 31-32.

In November 2007, Sundance selected *The Merry Gentleman* to be premiered at its largest theater, the Eccles Theatre, a prestigious opportunity often portending commercial success. *Id*. at ¶¶ 33-34. Upon learning of the selection and without notifying Merry Gentleman, Keaton approached Sundance personnel and informed them that unless Sundance screened his version of the film, he would not appear at the festival. *Id*. at ¶ 37. Wishing to have Keaton present, Sundance notified Merry Gentleman that the film would not be shown unless Keaton appeared. *Id*. at ¶ 40. At that point, Merry Gentleman had invested over $4 million in the film. *Id*. at ¶ 41.

The impasse was resolved with Merry Gentleman and Keaton signing a Settlement Agreement and Release ("Release") on December 14, 2007, in which Merry Gentleman agreed that Keaton's version of the film would be shown at Sundance. *Id*. at ¶ 42; Doc. 1-4. In addition, Merry Gentleman and Keaton released "any and all claims" against the other "arising from or relating to any Contracts in respect of or relating to the Picture, the provision or performance of directing … by [Keaton] … up to the date of this Agreement." Doc. 1-4 at 2-3, ¶ 1. Both parties also agreed to comply with their obligations under their existing directing services agreement. *Id*. at 3, ¶ 3(a). The Release is governed by Illinois law. *Id*. at 5, ¶ 5(c).

After the Release was executed, Keaton was responsible for preparing the film for both Sundance and commercial release, a responsibility that entailed duties such as cleaning up the cut, sound and color correction, and music selection. Doc. 1 at ¶ 46. Keaton chose music for the Sundance screening that exceeded the pre-determined budget, and when Merry Gentleman noted that the music selections were not within budget, Keaton insisted that his selections were "in"

3

and refused any further discussion. *Id*. at ¶ 48. Keaton also refused to cooperate with key members of the production and marketing teams with whom he had disagreements. *Id*. at ¶ 52.

Keaton's cut premiered at Sundance on January 18, 2008. *Id*. at ¶ 49. Despite Merry Gentleman's intention to release the film during the 2008 Christmas season, production delays pushed the release date back to May 2009. *Id*. at ¶¶ 50-51. And although the film was well received by critics, including Roger Ebert, its U.S. box office was less than $350,000. *Id*. at ¶ 54. On April 23, 2009, Keaton made a promotional appearance on ABC's *Good Morning America* in which he wore sunglasses and looked away from the screen during the showing of a clip of the film, and stated that he "ha[dn't] even seen [the film] for a while" after being asked by host Robin Roberts about the plot. *Id*. at ¶¶ 55-56.

Merry Gentleman filed this suit nearly four years later, on April 10, 2013, alleging that Keaton breached the directing services agreement in several respects throughout the parties' relationship and that those breaches delayed the film's release, increased costs, and harmed the film's prospects for commercial success. *Id*. at ¶ 57; Doc. 18 at 3. The court has subject matter jurisdiction under the diversity statute, 28 U.S.C. § 1332(a). Merry Gentleman, a limited liability company whose members are all citizens of Illinois, is a citizen of Illinois for diversity purposes. Doc. 19; *see Belleville Catering Co. v. Champaign Mkt. Place, LLC*, 350 F.3d 691, 692 (7th Cir. 2003) ("limited liability companies are citizens of every state of which any member is a citizen"). Keaton is a citizen of Montana, Doc. 1 at ¶ 4, and his loan-out company is a California corporation with its principal place of business in California, and thus a citizen of California, *id*. at ¶ 3. *See* 28 U.S.C. § 1332(c)(1) ("a corporation shall be deemed to be a citizen of every State … by which it has been incorporated and of the State … where it has its principal place of

4

business"). The complaint plausibly alleges that the amount in controversy exceeds the $75,000 threshold specified in § 1332(a). Doc. 1 at ¶ 5.

## Discussion

Keaton asserts three grounds for dismissal: (1) Merry Gentleman's allegations in ¶¶ 15-45 of the complaint, which allege breaches occurring before the Release's effective date, do not state a claim because Merry Gentleman released any such claims in the Release; (2) Merry Gentleman's allegations in ¶¶ 46-57 of the complaint, which allege breaches occurring after the Release's effective date, do not as a matter of law state a claim for breach of contract; and (3) Merry Gentleman did not perform its contractual obligations, and therefore cannot sue for breach of contract, because it did not provide Keaton with notice and the opportunity to cure his alleged breaches. Doc. 11. The court will consider these contentions in turn.

**I.     Whether The Release Indisputably Releases Any Pre-Release Breaches By Keaton**

Keaton argues that the portions of the complaint concerning events occurring before December 14, 2007, the Release's effective date, Doc. 1 at ¶¶ 15-45, fail to state a viable contract claim because the Release bars any claims arising from pre-Release conduct. Doc. 11 at 5. Merry Gentleman anticipated this defense in the complaint, which alleges that the Release is invalid because it lacks consideration and also because it was the product of duress. Doc. 1 at ¶ 45. The question here is whether the facts alleged by Merry Gentleman, with all inferences drawn in its favor, could show that the Release is invalid on either ground. Because the alleged facts make a viable case for duress, Merry Gentleman may proceed with its pre-Release claims.

Illinois law defines duress as "a condition where one is induced by a wrongful act or threat of another to make a contract under circumstances which deprive him of the exercise of his free will." *Rissman v. Rissman*, 213 F.3d 381, 386 (7th Cir. 2000) (quoting *Kaplan v. Kaplan*,

5

182 N.E.2d 706, 709 (Ill. 1962)). "Economic duress … is an affirmative defense to a contract," *Bank of Am., N.A. v. 108 N. State Retail LLC*, 928 N.E.2d 42, 57 (Ill. App. 2010), and exists where "the conduct of the party obtaining the advantage [is] shown to be tainted with some degree of fraud or wrongdoing," but not where "consent … is secured merely through hard bargaining positions or financial pressures." *Krilich v. Am. Nat. Bank & Trust Co. of Chicago*, 778 N.E.2d 1153, 1162 (Ill. App. 2002).

Merry Gentleman contends that Keaton's pre-Sundance conduct—his threat to effectively boycott the festival unless his second cut was shown—left Merry Gentleman with no practical choice but to enter into the Release, which provided not only that Keaton's second cut would be shown, but also that Merry Gentleman would release any pre-Release breaches by Keaton. This lack of practical choice, Merry Gentleman maintains, constitutes the kind of duress that invalidates the Release. Doc. 18 at 7. Keaton acknowledges Merry Gentleman's allegation that he breached the directing services agreement by directly approaching Sundance to "seize artistic control over the promotion of the film." Doc. 1 at ¶ 39; *see* Doc. 11 at 10. However, he argues that "an alleged breach by Keaton of the Directing Agreement cannot constitute duress under Illinois law because [Merry Gentleman] made no effort to use the remedies afforded by the courts to address the alleged breach." Doc. 11 at 10. Keaton's position, in other words, is that the Release cannot have been the product of duress because Merry Gentleman could have sued Keaton for his pre-Sundance conduct rather than enter into the Release.

It is true that duress ordinarily involves "some probable consequences of the threat for which the remedy for the breach afforded by the courts is inadequate." *Kaplan v. Keith*, 377 N.E.2d 279, 281 (Ill. App. 1978). That said, "a remote possibility of litigation as an alternative to settlement" does not "always scotch[] a claim of duress." *Rissman*, 213 F.3d at 386. The

6

Seventh Circuit in *Rissman* described a hypothetical example of duress that strikes close to home for purposes of this case:

> Illinois … applies a functional approach under which opportunistic exploitation of options that contracts were designed to foreclose equals duress. The party that performs first incurs sunk costs, which the other may hold hostage by demanding greater compensation in exchange for its own performance. The movie star who sulks (in the hope of being offered more money) when production is 90% complete, and reshooting the picture without him would be exceedingly expensive, is behaving opportunistically.

*Id.* at 386-87. *Rissman* took note of an older Ninth Circuit case finding duress where, after a fishing vessel reached a remote location, the crew refused to work until they were promised double wages. *Id.* at 387 (citing *Alaska Packers' Ass'n v. Domenico*, 117 F. 99 (9th Cir. 1902)). The crew's conduct constituted duress, the Seventh Circuit explained, because "the remote location and lack of an alternate crew had enabled the sailors to behave opportunistically" and because "[n]o one would have thought that the owner's ability to file a lawsuit could have helped; the fishing season would be over before the case could be adjudicated, and the seamen might have been judgment-proof anyway." *Ibid*.

The facts alleged by Merry Gentleman would allow the conclusion that a pre-Sundance suit by Merry Gentleman against Keaton, while certainly a possibility, was not a feasible alternative under the circumstances. Keaton's threat to not appear at Sundance unless Merry Gentleman agreed to allow his second cut to shown—an agreement memorialized in the Release—could be found opportunistic within the meaning of the duress doctrine in light of Merry Gentleman's allegations, assumed true at this stage, that: (1) Keaton understood that "Sundance officials wished to have [him] present at the premiere (both because of his name recognition and because Sundance is known as a director's festival)," Doc. 1 at ¶ 40; (2) by the time Sundance selected the film, Merry Gentleman had already invested more than $4 million in

7

the film's production, *id*. at ¶ 41; (3) "[h]aving a film selected to premiere at Sundance, particularly in the Eccles Theatre, is a highly coveted opportunity often leading to substantial commercial success," *id*. at ¶ 34; and (4) there were only two months between Sundance's offer in November 2007 to show *The Merry Gentleman* and the scheduled premiere in January 2008. On this factual predicate, Keaton's actions could be found akin to the hypothetical actor's conduct in *Rissman* and the sailors' conduct in *Alaska Packers' Association*—because Merry Gentleman was left with no practical choice but to relent to Keaton's demands, the Release could be found the product of duress and thus invalid under Illinois law. *See Carlile v. Snap-on Tools*, 648 N.E.2d 317, 319 (Ill. App. 1995) (holding that a release agreement may be invalidated on duress grounds where "defendants [Snap-on Tools] developed a fraudulent scheme to systematically bilk [plaintiffs] Snap-on dealers of their efforts and capital and, once the dealers were no longer financially viable, Snap-on managers pressured the dealers to sign termination agreements before Snap-on would buy back the dealers' remaining inventory"); *Kaplan v. Keith*, 377 N.E.2d at 280 (finding duress where the defendants would not close the sale of their home unless the plaintiff buyers signed a release agreement in which they agreed not to sue the defendants for recently discovered damaged portions of the home, noting that the buyers had "no alternative place to move as they had sold their house and had to give up possession on or about the date set for closing").

To summarize, because Merry Gentleman has plausibly alleged that the Release was the product of duress, the Release does not extinguish Merry Gentleman's claims regarding Keaton's pre-Release breaches of the directing services agreement. Accordingly, Keaton's motion to strike ¶¶ 15-45 of the complaint is denied.

**II.     Whether The Complaint Alleges Post-Release Breaches By Keaton**

Keaton also argues that the allegations in ¶¶ 46-57 of the complaint, which concern post-Release conduct, do not state a viable contract claim.  First, Keaton challenges the allegation that his failure to "prepare the film for screening to an audience" and his refusal to work with key members of production team violated the directing services agreement.  Doc. 1 at ¶¶ 46-47, 50-52.  Keaton maintains that his alleged conduct cannot have constituted a breach because he "had no obligation under the Directing Agreement to prepare a final cut of the Picture for release to the public."  Doc. 11 at 11.  For support, Keaton points to the complaint's allegations that "determinations … [of] how to proceed following the director's cut … were in the discretion of plaintiff, as producer," Doc. 1 at ¶ 31, and that "[u]nder the terms of his directing contract, Keaton was to deliver a 'first cut' of the movie, but other business and creative decisions, explicitly including the 'final cut' of the movie, belonged to plaintiff, as the producer," *id.* at ¶ 18.  Doc. 11 at 11-12.

Keaton's argument overlooks portions of the agreement that obligated him to assist in the preparation of a final cut.  The agreement's first paragraph provides that "[Keaton] shall render all usual and customary services rendered by individual directors of first-class motion pictures in the motion picture industry, and such other directing services as are reasonably requested by [Merry Gentleman] … until completion and delivery of [Keaton]'s first cut of the Picture," after which "[Keaton]'s services shall be non-exclusive but on a first-priority basis *until delivery of the answer print of the Picture*."  Doc. 1-2 at 1, ¶ 1 (emphasis added).  Paragraph 6 of the agreement required Keaton to deliver the "completed Picture to [Merry Gentleman] within [Merry Gentleman]'s approved post production schedule"; it also specified that the completed picture must "conform[] to all of the approved delivery schedule requirements," including that "the Picture shall be fully edited, titled, synchronized and assembled in all respects for first class

9

technical release." *Id*. at 6, ¶ 6. Thus, although Merry Gentleman had the final say over the film's final cut, the agreement imposed obligations on Keaton regarding preparation of the final cut, and the complaint's allegations that Keaton refused to cooperate with key staff and failed to prepare the film for timely screening states a plausible claim for breach of those obligations. *See See Johnson v. W.J. Turnes Co.*, 158 Ill. App. 378, 382 (1910) (although the architect is the "final arbiter" in a construction contract, the contractor working under the architect's specifications may be liable for failure to meet those specifications in preparing the final product); *Mayor of City of Columbus, Miss. v. Clark-Dietz*, 550 F. Supp. 610, 625-27 (N.D. Miss. 1982) (where the contract provided that the "Engineer/Architect shall decide any and all questions which may arise as to the quality and acceptability of … work performed, … and all questions as to the acceptable fulfillment of the Contract on the part of the Contractor," *id.* at 626, the contractor can still liable for breach of contract for his poor workmanship in preparing the final product).

Keaton next argues that no viable contract claim arises from the allegation that he selected music for the Sundance premiere that exceeded the music budget. Doc. 11 at 12. In support, Keaton cites ¶ 4.1 of the agreement, which states that Merry Gentleman and Keaton will "mutually approve[]" the film's music, and that where agreement cannot be reached, Merry Gentleman's view will prevail. Doc. 1-2 at 4, ¶ 4.1. Keaton maintains that Merry Gentleman "cannot allege it did not 'approve' of Keaton's music" given that it had tiebreaker rights and indeed later chose different music for the commercial release. Doc. 11 at 12.

Again, although Merry Gentleman had the final say over the music, the agreement nonetheless obligated Keaton to select music within the predetermined budget. Paragraph 8 of the agreement's Terms and Conditions provides that Keaton "shall not use any music … in the

10

Picture unless prior written approval and notice that such material has been cleared for such use has been obtained from [Merry Gentleman]." Doc. 1-2 at 13, ¶ 8.  The complaint plausibly alleges that Keaton did not obtain approval of any kind before making his music selection, Doc. 1 at ¶ 48.  If true, that allegation states a viable claim for breach of ¶ 8.  *See People ex rel. Dept. of Pub. Health v. Wiley*, 843 N.E.2d 259, 269 (Ill. 2006) (finding a material breach of contract where the plaintiff selected a medical practice location without obtaining the defendant's prior approval, despite contractual language requiring such approval, and rejecting the plaintiff's argument that prior approval was merely an "administrative requirement[]" and that failure to obtain approval did not harm the defendant).  This holding makes it unnecessary to decide at this point whether selecting out-of-budget music violates as well ¶ 1 of the agreement, which required that Keaton "render all usual and customary services rendered by individual directors of first-class motion pictures."  Doc. 1-2 at 1, ¶ 1.

Finally, Keaton contends that Merry Gentleman has no viable claim that he breached his obligation under ¶ 12 of the Terms and Conditions to provide "reasonable publicity and promotional services."  Doc. 1-2 at 14, ¶ 12.  Specifically, Keaton maintains that the sole allegation supporting this claimed breach, Keaton's appearance on *Good Morning America*, does not describe a breach of the publicity provision.  Doc. 11 at 13.  The argument fails.  Taking Merry Gentleman's allegations as true and drawing reasonable inferences in its favor, Keaton's conduct—which Merry Gentleman's brief, consistent with the complaint, Doc. 1 at ¶¶ 15-16, describes as "a downright bizarre appearance on Good Morning America with Robin Roberts, during which Keaton appeared unable to confirm what the film's plot was, and then very openly declined to watch the clip as it was shown, instead donning sunglasses and looking elsewhere," Doc. 18 at 13—could be viewed as a deliberate attempt to sabotage the film's marketing.  And

11

even if not rising to the level of deliberate sabotage, Keaton's conduct could be found to have fallen far short of his obligation to provide "reasonable publicity and promotional services." Doc. 1-2 at 14, ¶ 12.

Accordingly, Merry Gentleman has plausibly alleged that Keaton breached his contractual obligations during the post-Release period.

### III. Whether The Pleadings Establish That Merry Gentleman Failed To Perform Its Contractual Obligations

"The required elements of a breach of contract claim in Illinois are the standard ones of common law: (1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 560 (7th Cir. 2012) (internal quotation marks omitted). Keaton contends that the pleadings establish that Merry Gentleman failed to satisfy the fourth element, that it performed its obligations under the directing services agreement. Doc. 11 at 13. Specifically, Keaton maintains that Merry Gentleman violated its duty under ¶ 4 of the Terms and Conditions to provide Keaton with notice and an opportunity to cure in the event of default.

Keaton's argument fails. Paragraph 4 provides in relevant part: "[Y]our employment and compensation hereunder shall automatically be suspended during any and all periods: (i) that you do not render services hereunder because of … default (provided that [Merry Gentleman] agrees to notify you if you are in default and afford you seventy-two (72) hours to cure any default capable of cure))." Doc. 1-2 at 12, ¶ 4. Nothing in the pleadings suggests that Keaton's employment or compensation was suspended for any period of time; thus, Merry Gentleman's obligation in ¶ 4 to provide notice and an opportunity to cure never was triggered. In any event, ¶ 4 required Merry Gentleman to give Keaton notice and an opportunity to cure only before suspending his employment and compensation, not before filing suit for breach. *See Wis. Alumni*

12

*Research Found. v. Xenon Pharm., Inc.*, 591 F.3d 876, 888 (7th Cir. 2010) ("[a] contractual obligation to provide notice and an opportunity to cure a default prior to terminating a contract does not necessarily affect the aggrieved party's right to sue for breach," where "nothing in the [contract] prevented [plaintiff] from suing for breach within the 90-day cure period"). It follows that the pleadings do not establish that Merry Gentleman has failed to satisfy the fourth element of its contract claim.

**Conclusion**

For these reasons, Defendants' motion to dismiss and strike is denied. This ruling does not necessarily portend success for Merry Gentleman on summary judgment or at trial; that will depend on the evidence adduced in discovery or at trial, not on the pleadings.

August 14, 2013

United States District Judge