# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **Merry Gentleman, LLC, et al.** | |
| Plaintiffs, | |
| v. | No. 1:13-cv-02690 |
| **George and Leona Productions, Inc., and Michael Keaton,** | Judge Gary Feinerman |
| Defendants. | |
| **George and Leona Productions, Inc., and Michael Keaton,** | |
| Counter-Claimants, | |
| v. | |
| **Merry Gentleman, LLC,** | |
| Counter-Defendant, | |
| **Paul Duggan,** | |
| Third-Party Defendant. | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT (Fed.R.Civ.P. 56)**

**TABLE OF CONTENTS**

Page

I. INTRODUCTION .................................................................................................................1

II. STATEMENT OF FACTS ...................................................................................................2

    A. Decision to Invest in the Film Made Before Keaton Became Director. ..................2

    B. After the Director Becomes Sick, Plaintiff Hires Keaton to Direct the Film. ........2

    C. Participants in Filming and Post-Production Praise Keaton's Directing. ...............3

    D. The Film is Selected for Showing at the Prestigious Sundance Film Festival. ......4

    E. The Film *Merry Gentleman* was a Critical and Artistic Success. ..........................5

    F. Most Independent Films Lose Money. ...................................................................6

III. PLAINTIFF'S CLAIM FOR BREACH OF CONTRACT ...................................................6

IV. LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT ...................................7

V. SUMMARY JUDGMENT IS WARRANTED BECAUSE THERE IS NO EVIDENCE THAT DEFENDANTS' ALLEGED BREACHES OF CONTRACT CAUSED LEGALLY AWARDABLE DAMAGES ...........................................................7

    A. Applicable Law Requires Proof of Causation and Damages. .................................8

    B. Plaintiff Cannot Establish Causation. .....................................................................9

    C. Plaintiff Cannot Prove Damages With Reasonable Certainty. ..............................12

VI. CONCLUSION ...................................................................................................................15

**TABLE OF AUTHORITIES**

**Page**

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................................................ 7

*Buckner v. Sam's Club, Inc.*,
    75 F.3d 290 (7th Cir. 1996) ................................................................................................ 9

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................................................ 7

*In re Ill. Bell Tel. Link-Up II*,
    994 N.E.2d 553 (Ill. App. Ct. 2013) .................................................................................... 8

*Levin v. Grecian*,
    974 F.Supp.2d 1114 (N.D. Ill. 2013) ................................................................ 11, 12, 13, 14

*Mindgames, Inc. v. W. Publ'g Co.*,
    218 F.3d 652 (7th Cir. 2000) ............................................................................. 1, 11, 12, 14

*Modrowski v. Pigatto*,
    712 F.3d 1166 (7th Cir. 2013) ............................................................................................ 7

*Shepard v. State Auto. Mut. Ins. Co.*,
    463 F.3d 742 (7th Cir. 2006) .............................................................................................. 8

*Stuart Park Assocs. Ltd. P'ship v. Ameritech Pension Trust*,
    51 F.3d 1319 (7th Cir. 1995) ............................................................................................ 12

*TAS Distrib. Co. v. Cummins Engine Co.*,
    491 F.3d 625 (7th Cir. 2007) .................................................................................... 8, 9, 12

*Transp. & Transit Assocs., Inc. v. Morrison Knudsen Corp.*,
    255 F.3d 397 (7th Cir. 2001) .............................................................................................. 8

**RULES**

Fed. R. Civ. P. 56(a) ...................................................................................................................... 7

**OTHER AUTHORITIES**

GOLDMAN, WILLIAM,
    ADVENTURES IN THE SCREEN TRADE (1983) ........................................................................ 1

I.      **INTRODUCTION**

As the screenwriter William Goldman famously said about making movies, "Nobody knows anything" (WILLIAM GOLDMAN, ADVENTURES IN THE SCREEN TRADE 39 (1983)), a sentiment echoed by Judge Richard Posner who noted that the "success of a . . . book or movie [ ] is so uncertain." *Mindgames, Inc. v. W. Publ'g Co.*, 218 F.3d 652, 658 (7th Cir. 2000).

Plaintiff Merry Gentleman, LLC has sued Defendant Michael Keaton for allegedly breaching the parties' Directing Agreement, asserting that Keaton's actions as director of the motion picture *Merry Gentleman* (the "Film") caused the Film to underperform financially.[1] Relying upon only speculation and conjecture, and not admissible evidence, Plaintiff hopes to recover either $4 million that it claims the Film should have sold for at the Sundance Film Festival ("Sundance"), or the entire $5.5 million that Plaintiff invested in the Film.

Plaintiff's single claim for breach of contract fails as a matter of law for at least two reasons. *First*, the Directing Agreement does not make Keaton the guarantor of the Film's commercial success. There is no evidence that anything Keaton did or did not do as director caused the Film not to sell or underperform at the box office. To the contrary, all of the evidence shows that Keaton complied with the Directing Agreement, but that intervening causes resulted in the Film's disappointing financial performance. *Second*, Plaintiff's damages claims fail under Illinois law because Plaintiff is unable to prove those damages with reasonable certainty. Because there is no evidence to establish either causation or damages in connection with Plaintiff's contract claim, summary judgment in favor of Defendants is appropriate.

---

[1]     As the Court is aware from Defendants' prior motion to dismiss, Tom Bastounes (one of the primary actors and investors in the Film, and the Manager of Plaintiff Merry Gentleman, LLC) did not support the filing of this action and does not believe there is evidence to support the Complaint's allegations. (*See* Declaration of Tom Bastounes, ¶¶ 15-17, D.I. 55-1.)

II. <u>**STATEMENT OF FACTS**</u>

    A.     <u>**Decision to Invest in the Film Made Before Keaton Became Director.**</u>

*Merry Gentleman* is the story of a young woman (played by Mary Macdonald) who moves to Chicago to escape her abusive husband, and enters into a complicated relationship with a suicidal hit man (Keaton). Ron Lazzeretti wrote the script, which he shared with Tom Bastounes. (MF 6.)[2] Bastounes and Lazzeretti had limited experience in the movie business, having worked together on one prior small-budget film released in 1997 (titled *The Opera Lover*), which, according to Bastounes, "only opened in two theaters and maybe did, I don't know, less than $10,000." (MF 7.)

Bastounes liked the *Merry Gentleman* script, so he invited potential investors to a luncheon at Gibson's Steak House, at which he told them he was trying to attach a star to the film and planned on a budget of $5 million. (MF 8.) Paul Duggan, a long-time CPA who now operates a hedge fund and considers himself to be a sophisticated investor, had no experience in making movies, but he said he would invest and signed papers agreeing to do so in February of 2006. (MF 9-10, 13-14.) At the time Duggan decided to invest, Lazzeretti – and not Keaton – was the director of the Film. (MF 15.)

    B.     <u>**After the Director Becomes Sick, Plaintiff Hires Keaton to Direct the Film.**</u>

When Lazzeretti was diagnosed with a ruptured appendix in December 2006, Keaton offered to direct the Film. (MF 15.) The Producers (Duggan and Bastounes) agreed, even though they knew Keaton had not previously directed a motion picture. (*Id.*) Plaintiff and Keaton entered into the Directing Agreement dated February 1, 2007, in which Keaton agreed to "render all usual and customary services rendered by individual directors of first-class motion

---

[2]     Defendants' Statement of Material Facts pursuant to Local Rule 56.1 is filed concurrently herewith and cited herein as "MF #" referring to the paragraph number.

2

pictures" (¶ 1) in return for a fixed directing fee of $100,000 (¶ 2) and a "directed by" credit (¶ 3). Plaintiff and Keaton had "mutual[] approv[al]" rights, but Plaintiff held the "tiebreaker" with respect to "the screenplay, locations, budgets, schedules, . . . [various cast and crew], music, laboratories (consultation only) and facilities," and "[a]ll other business and creative decisions with respect to the Picture shall be at Company's sole discretion, including, without limitation, Company having final cut on the Picture." (MF 16-18.)

### C. Participants in Filming and Post-Production Praise Keaton's Directing.

*Merry Gentleman* was filmed, with Keaton directing, "in Chicago during March and April 2007." (MF 19.) Actor and investor Tom Bastounes testified that "Mr. Keaton acted professionally and competently as the Director throughout the filming." (MF 20.) Ron Lazzeretti, who was on set during filming, testified that "I very much liked what Michael was doing . . . . I thought he was creating a style and a look for it that I really liked." Lazzeretti praised Keaton's "energy and enthusiasm" and explained that "I felt like the crew was very much behind him. The production, by and large, was a great experience in that regard. And ultimately, a collaborative one." (MF 21.)

During post-production, which started in May 2007, Keaton worked with film editors Grant Myers and Howard Smith to edit the Film. Myers testified that Keaton was intimately involved in the editing process and provided him with direction every day. (MF 22.) Myers rated Keaton's performance as a director "an A" and testified that Keaton was "much better" than any other director with whom Myers has ever worked. (MF 23.) Film editor Howard Smith, who has extensive experience working with top directors in the film industry, worked very closely with Keaton during the editing process and testified "[h]e was great. He's a terrific

3

collaborator. He's incredible." Smith rated Keaton "right at the top" of the several first-time directors with whom he has worked. Smith described Keaton's abilities as a director as follows:

> Michael's sense of cinema is very, very intense. And he's absolutely right. I mean, he's like – he's so clear about what it is he's trying to achieve, and he can so articulate it, that I have to rate him as one of – look, I have been very fortunate. I have worked with a lot of really great directors, directors who really are great filmmakers, and it's always a pleasure to work with these people, and Michael is definitely in that category. (MF 24-25.)

### D. The Film is Selected for Showing at the Prestigious Sundance Film Festival.

The Film's producers did not sell the rights to the Film before it was made and shown. Instead, they planned to submit the Film to Sundance, which Plaintiff describes as "the largest and most prestigious independent film festival in the United States." (MF 27-28.) Notwithstanding the alleged delays about which Plaintiff now complains, in the fall of 2007, Plaintiff – as planned – submitted the Film for exhibition at the January 2008 Sundance Film Festival. (MF 29.) Many independent films are submitted each year to Sundance, with very few selected. (MF 30.) Indeed, for the 2008 Festival, only about 3% of the more than 3,600 films submitted (*i.e.*, 121 films) were selected for showing. (*Id.*)

The Film premiered at Sundance on January 18, 2008 at the Eccles Theater, the Festival's largest theater. (MF 31.) *USA Today* identified *Merry Gentleman* as one of the 10 films "that stand out" at the 2008 Festival. (MF 32.) The Film received a positive response from critics and audiences at Sundance, including glowing reviews from Hollywood's two most respected trade publications, *Variety* and *The Hollywood Reporter*. (MF 33-35.) Keaton participated in every press appearance requested of him at Sundance. (MF 36.)

Plaintiff hired one of the top talent agencies, Creative Artists Agency (CAA), to attempt to sell the Film's distribution rights. (MF 37.) It is common for producers and financiers who

4

pursue a film festival strategy to fail to obtain a sale of domestic rights. (MF 46.) The market for independent films was highly selective during this period with market conditions at the 2008 Festival "competitive but cautious." (MF 38-39.) Several highly anticipated and publicized films failed to sell at the 2008 Festival, including films featuring such stars as Robert DeNiro, Tom Hanks, John Malkovich and Amy Adams. (MF 40.) The fact that the Film did not sell can be attributed to a combination of factors, most notably adverse market conditions and the overall commercial viability of the dark script. (MF 45.) There is no evidence to suggest that Keaton's directing or his appearances at the Festival were viewed in anything other than a positive light. (MF 41, 43, 46.) Indeed, there is no evidence that Keaton's actions at any time caused the Film not to sell. (MF 46.)

E. **The Film *Merry Gentleman* was a Critical and Artistic Success.**

After Sundance, the Producers entered into distribution agreements with Samuel Goldwyn Films ("Goldwyn") for domestic theatrical distribution, Genius Products for home video, and Lightning Entertainment for international distribution. (MF 47.) It is customary for films that premiere at major film festivals to undergo subsequent editorial and music changes, and the producers of the Film and Goldwyn asked Keaton to make changes to the version of the Film shown at Sundance, which he did. (MF 48-49.)

Plaintiff now complains about a "Christmas" movie being released in May of 2009. (Compl. ¶ 51, D.I. 1.) In fact, however, Duggan and Bastounes made that decision after being assured by Goldwyn that it did not matter whether the Film was released in May or in December. (MF 50.) The Film received "substantial critical praise" from many sources, including the national film critic Roger Ebert, *The New York Times*, the *Los Angeles Times*, *Daily Variety*, and TV show host David Letterman, among others. (MF 51.) To promote the Film's release, Keaton

5

made several television appearances, including an appearance on CBS's *Late Night With David Letterman* and on ABC's *Good Morning America*. (MF 52.) The amount of nationwide publicity the Film received as a result of Keaton's appearances was highly unusual for a small-budgeted independent film. (MF 53.) Indeed, Plaintiff cannot identify any director of a $5 million film who did more publicity than Keaton did for *Merry Gentleman*. (MF 54.)

### F.     Most Independent Films Lose Money.

Most independent films lose money for the investors. (MF 64.) Plaintiff produced the Film at a time when the independent film marketplace was widely known to be a very high risk and low return business. (MF 65.) Plaintiff's plan to sell the distribution rights at Sundance had inherent risks because a well-received film may not achieve optimal sales results at a festival due to other competitive products being marketed in the same short window. (MF 67.) There was a high probability that the Film would lose a substantial portion of its investment. (MF 65.)

Furthermore, Plaintiff failed to mitigate the risk associated with the Film, causing it to be even higher risk than is customary for independent films. Plaintiff, for example, failed to appoint an international sales agent prior to completion of principal photography, complete pre-sale contracts with international distributors prior to completion of principal photography, or utilize a film completion bond company during production or post-production. (MF 66.)

### III.    PLAINTIFF'S CLAIM FOR BREACH OF CONTRACT

Plaintiff's Complaint contains a single claim for breach of the Directing Agreement between Plaintiff Merry Gentleman, LLC and Keaton. (Compl. ¶¶ 58-62.) Plaintiff alleges that during post-production after filming completed, Keaton "did not fulfill the duties of a director . . . such as selecting and editing together the best scenes [which] were left to subordinates without direction from Keaton." (*Id.*, ¶ 22.) Plaintiff also claims that as a result of Keaton's

6

alleged refusal to cooperate after Sundance, the Film could not be released until May 2009. Plaintiff claims that this delay and Keaton's alleged failure to properly promote the Film resulted in the Film underperforming at the box office. (*Id.*, ¶¶ 50-57.)

## IV. LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the admissible evidence would support the trier of fact's conclusion either way on the question, and a fact is "material" if, under the substantive law, it would make a difference to the outcome of a case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Where, as here, the nonmoving party (Plaintiff) will have the burden of proof at trial, the moving parties (Defendants) need only show that there is no evidence to support a necessary part of the nonmoving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden is met by simply "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.*; *see Modrowski v. Pigatto*, 712 F.3d 1166, 1168-1170 (7th Cir. 2013) (affirming summary judgment to defendant who pointed out in its motion for summary judgment that plaintiff could not support its claim).

## V. SUMMARY JUDGMENT IS WARRANTED BECAUSE THERE IS NO EVIDENCE THAT DEFENDANTS' ALLEGED BREACHES OF CONTRACT CAUSED LEGALLY AWARDABLE DAMAGES

Plaintiff argues that but for Keaton's alleged breaches of the Directing Agreement, the Film would have sold at Sundance for $4 million, which Plaintiff seeks to recover as its damages. Alternatively, Plaintiff argues it would not have invested $5.5 million in the Film if it had known Keaton would breach the Directing Agreement, and Plaintiff seeks to recover that full amount as its breach of contract damages. (Plaintiff's Initial Disclosures, p. 2 (Ex. M to

7

Declaration of Christopher R. Hagale in Support of Defendants' Motion for Summary Judgment).) Whatever theory of damages Plaintiff proffers, Plaintiff is unable to produce any evidence to (1) establish causation or (2) prove damages to a reasonable degree of certainty.

### A. **Applicable Law Requires Proof of Causation and Damages.**

Under Illinois law, in order to plead a claim for breach of contract, a plaintiff must allege: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) (citation omitted). "The party requesting damages must show causation, that is that the alleged breach is the cause of those damages, with reasonable certainty." *Id*. at 633 (citation omitted). Damages for breach of contract "which are not the proximate cause of the breach are not allowed." *In re Ill. Bell Tel. Link-Up II*, 994 N.E.2d 553, 558 (Ill. App. Ct. 2013) (citation omitted).

Moreover, plaintiff must prove damages "to a reasonable degree of certainty." *TAS Distrib.*, 491 F.3d at 632 (citation omitted). Illinois courts consistently reject claims for damages "based on speculation or conjecture." *Id*. at 633 (citation omitted); *see also Transp. & Transit Assocs., Inc. v. Morrison Knudsen Corp.*, 255 F.3d 397, 401 (7th Cir. 2001) (where plaintiff cannot establish damages for breach of contract, "[t]here is no point in litigating a case . . . so the district court was right to grant summary judgment to [defendant]").

Courts routinely grant summary judgment in favor of defendants in breach of contract actions when, as here, plaintiff is unable to produce evidence to establish causation and/or prove damages to a reasonable degree of certainty. *See, e.g.*, *Shepard v. State Auto. Mut. Ins. Co.*, 463 F.3d 742, 745-49 (7th Cir. 2006) (affirming summary judgment because plaintiff failed to prove that defendant's breach of contract caused damages and failed to prove damages with a sufficient

8

degree of certainty); *TAS Distrib.*, 491 F.3d at 634-637 (affirming summary judgment based on "new business" rule and fact plaintiff could not prove damages to a reasonable degree of certainty); *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 293 (7th Cir. 1996) (affirming summary judgment because the plaintiff could not establish the "critical element of causation").

### B. Plaintiff Cannot Establish Causation.

Under any damage theory, Plaintiff must prove by a preponderance of the evidence that Keaton's actions in his role as director of the Film caused the damages Plaintiff now seeks to recover. Thus, Plaintiff must come forward with admissible evidence establishing that Keaton's actions as director (1) caused potential distributors not to purchase the Film and (2) caused the Film to underperform financially. Summary judgment is warranted because there is **no evidence** in the record to support Plaintiff's claims that Keaton's alleged breaches caused any damage to Plaintiff. To the contrary, the evidence proves the opposite – namely, that there were a myriad of different factors and conditions, **completely unrelated to Keaton's actions**, which caused the Film not to sell or perform up to Plaintiff's expectations.

The many forces at work here, unrelated to Keaton, make it impossible for Plaintiff to establish causation. The Film received positive reviews from critics at Sundance and again when it was released, so the quality of the film-making, the actors' performances, and Keaton's directing performance cannot be the cause of any alleged underperformance. (MF 32-35, 41, 43, 46, 51-54.) What makes Plaintiff's damage theories so speculative is that most independent films lose money for the investors. (MF 64.) Indeed, as co-Producer Bastounes testified, "the Film did not do well at the box office, but it was not Mr. Keaton's fault." (MF 56.)

The market that the Film's producers encountered when they went to Sundance in January 2008 was tough and competitive, with very few films experiencing any success at the

9

Festival or thereafter. (MF 30, 38-40, 65-67.) Plaintiff's international distributor explained to producers Duggan and Bastounes that "[a]t the best of times, the independent film business is a high risk undertaking, and today's depressed marketplace and volatile landscape compound those risks exponentially." He told them, "the frustration is that this is a good film. But as I said, good is not always enough. Story, target demographic, marketplace competition, cast … all these things come into play." (MF 58.)

Duggan's claim today that Keaton somehow caused the Film to underperform is contrary to his words and actions at the time. When the producers and Keaton were finishing the Film in 2009, Duggan expressed his admiration to Keaton for his performance:

> Based on your participation we believe that the final cut of the film represents a collaboration of all of the parties to produce a picture that has maximum commercial prospects ….[T]his is still your picture, Michael, and it is one that you can be justifiably proud about. You have put your heart and soul into this and it is now the time to be recognized for that effort. (MF 59.)

Moreover, when the Film was released, Duggan admitted that factors unrelated to Keaton's actions resulted in a film that "will not make us money. Such is life." On May 20, 2009, Duggan wrote to a friend:

> The film is thoughtful adult fare, not for all, but good nevertheless. Top five critics in US love it. We need to keep it alive and show in many cities, but have to cost justify the roll out. A tough business decision.
>
> I sense we made a film that will be watched for years, but will not make us money. Such is life. (MF 60.)

Duggan recognized the need to market the Film. Unfortunately, Plaintiff did not "keep it alive and show in many cities." To the contrary, Plaintiff spent a relatively small amount of money on print and advertising for the Film, which made it more likely the Film would not succeed at the box office. (MF 55.)

10

A review of the CAA Sales Feedback Grid prepared by Plaintiff's sales agent after Sundance, which memorializes all the comments from proposed distributors, confirms that the Film itself and Keaton's directing performance were held in high regard. But the comments show that the script for *Merry Gentleman* lacked the broad commercial appeal which distributors require in the brutally competitive market of theatrical film distribution. (MF 42-44.)

There can be no reasonable dispute that a variety of factors impact the commercial success of this or any film. (MF 26, 38-40, 45-46, 56-63.) Plaintiff is unable to show that anything Keaton did or did not do in directing *Merry Gentleman* was one of those factors.

This Court confronted a similar situation in *Levin v. Grecian*, 974 F.Supp.2d 1114 (N.D. Ill. 2013), when the author of a novel, Grecian, sought damages for breach of contract from his literary agent, Levin, who allegedly did not use his best efforts to sell the author's works over a seven-year period. The Court granted summary judgment to Levin because, *inter alia*, Grecian could not establish causation. The Court found that "[t]here is no evidence that Levin, by working harder, could have obtained a $500,000 deal any sooner than he and Fishman did." *Id.* at 1128. The Court also found that the author could not establish that the agent's failure to sell the author's other works caused any damages because "[the author] does not identify any one novel in particular and say that it was of saleable quality or that [the agent] should have sold it. And [the author] certainly provides no evidence that any such novel would have had success comparable to *The Yard's*." *Id.*

In the *Mindgames* case, a board game's inventor (the "licensor") entered into a licensee agreement with a marketer of games (the "licensee") who agreed to promote the game and pay a royalty. When sales dropped, the licensor sued for royalties it claimed it would have earned had the licensee not failed to comply with the promotional obligations under the contract.

11

In affirming summary judgment for defendant-licensee, Judge Posner held that "[w]hat makes [the licensor's] claim of lost royalties indeed dubious is . . . that the success of a board game, like that of a book or movie, is so uncertain." *Mindgames, Inc.*, 218 F.3d at 658. Judge Posner reasoned that "a novice writer should not be permitted to obtain damages from his publisher on the premise that but for the latter's laxity he would have had a best seller, when only a tiny fraction of new books achieve that success." *Id*. Moreover, in response to evidence that sales dropped after the first year of the license, Judge Posner concluded, "[t]he public is fickle." *Id*.

Very few independent films make money for the investors. In the tough and competitive market of 2008-09, *Merry Gentleman* enjoyed great artistic success at the prestigious Sundance Festival and upon release. Plaintiff can present no evidence that Defendants' actions caused Plaintiff to suffer any harm. Thus, as in *Levin* and *Mindgames*, summary judgment should be entered in favor of Defendants because Plaintiff cannot satisfy the causation requirement.

        C.      **<u>Plaintiff Cannot Prove Damages With Reasonable Certainty</u>.**

Plaintiff cannot recover damages because the Film is akin to a new business, and, in any event, Plaintiff is unable to prove damages to a reasonable degree of certainty, as is required under Illinois law. *TAS Distrib.*, 491 F.3d at 632-33. "The general rule under Illinois law is that a new business has no right to recover lost profits." *Id.* at 634 (citation omitted); *accord Stuart Park Assocs. Ltd. P'ship v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir. 1995). Even if the "new business rule" did not apply, Illinois law "clearly requires that damages be proved to a reasonable certainty." *TAS Distrib.*, 491 F.3d at 635. Summary judgment is warranted because Plaintiff cannot prove damages with the necessary degree of certainty given the inherent risks and uncertainty in the independent movie business and the other market forces at work here.

Plaintiff's sole business is the film *Merry Gentleman*. (MF 11.) The key individuals involved – Lazzeretti, Bastounes and Duggan – had little or no experience in making films. Ten years earlier, Lazzeretti and Bastounes were involved in a small-budgeted film (*The Opera Lover*) that was a complete failure. (MF 7.) Duggan had no experience with films. (MF 10.) Under Illinois law, therefore, Plaintiff must be viewed and treated as a "new business," which bars Plaintiff from recovering damages such as lost profits. *Levin*, 974 F.Supp.2d at 1129-30.

Even if the "new business" rule is not applied, Plaintiff still cannot prove damages with the degree of certainty required under Illinois law. The independent film market is inherently risky. Indeed, most independent films lose money for the investors. (MF 64.) And, at the time the Film was produced, the independent film market was widely known to be very high risk and low return. (MF 65.) That risk increased because Plaintiff failed to mitigate its downside risk by, for example, appointing an international sales agent, completing pre-sale contracts with international distributors prior to completion of principal photography, or utilizing a film completion bond company during the production or post-production process. (MF 66.) Moreover, Plaintiff's plan to sell the Film at Sundance had "inherent risks" because of the competitive atmosphere at film festivals. (MF 67.) Even Duggan, who filed this action, admitted at his deposition that he does **not** "know how much more money the film would have made at the box office if Mr. Keaton had not breached his directing agreement." (MF 57.) And when asked who at Sundance would have purchased the Film if Keaton had not interfered with Plaintiff's contractual rights, Duggan testified that "[w]e'll never know." (*Id.*)

Case law supports summary judgment in favor of Defendants on the element of damages. In *Levin*, this Court granted the agent's summary judgment motion because, *inter alia*, (a) the author failed to establish damages with reasonable certainty because he provided no evidence

13

that his earlier works would have been as successful as his later works, *Levin*, 974 F.Supp.2d at 1128-29, and (b) Illinois's "new business rule" barred any recovery because the author was not "previously established as a novelist at the time that [defendant] failed to sell his works," *id*. at 1129-30. In *Mindgames*, the inventor – like Plaintiff here – had no track record when he created his board game, so the licensor could not rely upon success with other games in trying to prove damages to a reasonable certainty. *Mindgames, Inc.*, 218 F.3d at 658.[3] Judge Posner concluded that summary judgment had been properly granted to defendant licensee because the licensor's "proof of damages is indeed excessively speculative." *Id*. at 659.

      This case is similar to *Mindgames* and *Levin*. Plaintiff was a novice in the film-making business that had never before created any film, let alone a successful one. And, like in *Mindgames* and *Levin*, Plaintiff cannot cite to any evidence to prove that the Film would have achieved sales with any degree of certainty in the risky and uncertain movie business. Moreover, unlike the author in *Levin*, Plaintiff has not created a successful work after Keaton's alleged breach, thus depriving Plaintiff of even the feeble evidence of comparable sales in *Levin*.

      Plaintiff's attempt to recover a hypothetical $4 million sales price for the Film or the full amount of its $5.5 million investment assumes a level of performance for the Film that is entirely speculative. Plaintiff has not and cannot produce the evidence necessary to establish the requisite element of damages. Accordingly, summary judgment is appropriate because Plaintiff is a "new business," and, in any event, Plaintiff cannot established damages with reasonable certainty.

---

[3]    The *Mindgames* case was decided under Arkansas law, but the Seventh Circuit based its ruling on Arkansas's requirement, like Illinois's, that plaintiff's damages claim must be more than speculative. *Mindgames*, 218 F.3d at 658-59.

14

## VI. CONCLUSION

There is no evidence from which a reasonable fact finder could conclude that Keaton's actions as director harmed the financial and commercial performance of the Film. Keaton performed as required under the parties' Directing Agreement – he directed and delivered a film that achieved critical success and found distributors in all markets. The contract did not make Keaton the guarantor of the Film's financial success, and he did not control the factors which determined the financial performance of the Film. Because Plaintiff cannot establish causation and cannot prove damages with reasonable certainty, Defendants respectfully request that their motion for summary judgment be granted in its entirety.

Dated: September 8, 2014

Respectfully submitted,

*/s/ Christopher Hagale*
Sidney Herman (# 3121807)
Hamilton Hill (# 6275123)
Christopher Hagale (# 6306085)
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street
Chicago, IL 60654
Telephone: (312) 494-4400

Michael J. Kump
Jeremiah Reynolds
KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 Wilshire Blvd., 3rd Floor
Santa Monica, CA 90401
Telephone: (310) 566-9800

*Attorneys for Defendants and Counter-Claimants George and Leona Productions, Inc. and Michael Keaton*

## CERTIFICATE OF SERVICE

I, Christopher Hagale, an attorney, hereby certify that a true and correct copy of the foregoing document entitled **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (Fed.R.Civ.P. 56)** was electronically filed with the Clerk of the Court for the Northern District of Illinois using the CM/ECF System and emailed to counsel for Plaintiff listed below on September 8, 2014.

Matthew D. Tanner
Roeser Bucheit & Graham LLC
Two N. Riverside Plaza, Suite 1420
Chicago, IL  60606
Telephone: (312) 300-2522
mtanner@rbglegal.com

*Attorney for Plaintiff Merry Gentleman, LLC
and Third-Party Defendant Paul Duggan*

/s/ Christopher Hagale
Christopher Hagale (#6306085)
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street
Chicago, IL  60654
Telephone: (312) 494-4400
Facsimile:  (312) 494-4440
chris.hagale@bartlit-beck.com

*Attorney for Defendants George and Leona
Productions, Inc. and Michael Keaton*