**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **Merry Gentleman, LLC,**<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>**George and Leona Productions, Inc., and Michael Keaton,**<br><br>　　　　　　Defendants.<br><br>**George and Leona Productions, Inc., and Michael Keaton,**<br><br>　　　　　　Counter-Claimants,<br><br>　v.<br><br>**Merry Gentleman, LLC,**<br><br>　　　　　　Counter-Defendant,<br><br>**Paul Duggan,**<br><br>　　　　　　Third-Party Defendant. | No. 1:13-cv-02690<br><br>Judge Gary Feinerman |

**LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFF'S CLAIM FOR BREACH OF CONTRACT**

Pursuant to Local Rule 56.1(a)(3), Defendants George and Leona Productions, Inc. and Michael Keaton (collectively, "Defendants"), by and through their attorneys, submit this statement of material facts as to which there is no genuine issue and that warrant entry of summary judgment in favor of Defendants against Plaintiff Merry Gentleman, LLC ("Plaintiff"), as requested in Defendants' Motion for Summary Judgment.

**PARTIES AND JURISDICTION**

1. Plaintiff Merry Gentleman, LLC is an Illinois limited liability company organized under the laws of the State of Illinois, whose members are citizens of Illinois, that was formed for the purpose of financing, producing and exploiting the motion picture *Merry Gentleman* (the "Film"). (Compl. ¶ 2, D.I. 1; Ex. N, Declaration of Tom Bastounes ("Bastounes Decl.") ¶ 2, D.I. 55-1.)[1]

2. Defendant Michael Keaton ("Keaton") is a citizen of Montana and an actor in motion pictures and television, who played the lead male role in the Film. (Compl. ¶¶ 4, 8-9; Amended Answer ¶¶ 4, 8-9, D.I. 46.) Keaton also made his directorial debut directing the Film. (Compl. ¶¶ 11-12; Amended Answer ¶¶ 11-12.)

3. Defendant George and Leona Productions, Inc. is a corporation organized under the laws of the State of California, with its principal place of business in California, and is the loan-out corporation through which Keaton's professional services are provided to third parties, including acting and directing services provided to Plaintiff in connection with the Film. (Compl. ¶ 3; Amended Answer ¶ 3.)

4. Plaintiff alleges that this Court has jurisdiction over Plaintiff's claim pursuant to 28 U.S.C. § 1332(a), in that the parties are of diverse citizenship and the Complaint alleges the matter in controversy exceeds $75,000 exclusive of interest and costs. Defendants dispute that Plaintiff's matter in controversy exceeds $75,000 exclusive of interest and costs because Defendants believe Plaintiff has no damages, but Defendants do not dispute that the parties are of diverse citizenship. (Compl. ¶ 5; Amended Answer ¶ 5.)

---

[1] Defendants' Exhibit A is attached to the Declaration of Daniel J. Rosett ("Rosett Decl."). Defendants' Exhibits B – T are attached to the Declaration of Christopher R. Hagale ("Hagale Decl."). Both are filed concurrently herewith.

5.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (3), in that a substantial portion of the events or omissions complained of occurred within this judicial district, and in that Defendants are subject to this Court's personal jurisdiction. (Compl. ¶ 6; Amended Answer ¶ 6.)

## FACTS OF THE CASE

**A.  Decision to Invest in Film Made Before Keaton Became Director.**

6.  Ron Lazzeretti ("Lazzeretti") wrote the screenplay for the Film starting in the 1990's, which he allowed Tom Bastounes ("Bastounes") to read. (Ex. Q, Lazzeretti Dep. 41:9-43:1; Hagale Decl. ¶ 17; Ex. O, Bastounes Dep. 13:19-14:7; Hagale Decl. ¶ 15.)

7.  Lazzeretti had worked as a writer, director, or producer on only one full-length movie (*The Opera Lover*) released before the Film. (Ex. Q, Lazzeretti Dep. 19:18-23, 24:18-25.) Bastounes also produced and starred in *The Opera Lover*, which was Bastounes's only other experience in the movie business before his involvement with the Film. (Ex. O, Bastounes Dep. 8:19-21, 11:22-13:6.) *The Opera Lover* was made in 1997 (*id*. at 7:25-9:22) and had a budget of around $800,000 (*id*. at 10:17-20). *The Opera Lover* was not a financial success; Mr. Bastounes testified that the box office was "[n]othing. It was – It only opened in two theaters and maybe did, I don't know, less than $10,000." (*Id*. at 10:11-16, 13:7-12.)

8.  Bastounes liked Lazzeretti's script, and Bastounes testified that "[w]e decided we would try to make the movie if we could get a star attached and if we could get – you know, raise – raise the funds to do it." Bastounes invited 15-20 potential investors to a luncheon at Gibson's Steak House in Chicago, at which he told them he was trying to attach a star to the Film and planned on a budget of $5 million. (*Id*. at 14:21-16:6.)

2

9. Two of the attendees at Bastounes' luncheon – Paul Duggan ("Duggan") and Dennis Nardoni ("Nardoni") – expressed their interest in investing in *Merry Gentleman*. (*Id*. at 16:7-22.)

10. Duggan became a CPA in 1974 and had his own accounting firms in Chicago until approximately 2000, when he began operating a hedge fund in Chicago named Jackson Boulevard Capital Management. (Ex. P, Duggan Dep. 16:10-20:13; Hagale Decl. ¶ 16.) Duggan considers himself to be a sophisticated investor. (*Id*. at 83:11-13.) Duggan had no experience in the motion picture industry before his involvement with the Film. (*Id*. at 20:21-21:8.)

11. On December 20, 2004, Plaintiff Merry Gentleman, LLC was formed as a limited liability company with the State of Illinois. (Ex. L, LLC File Detail Report for Merry Gentleman, LLC from the website for the Illinois Secretary of State; Hagale Decl. ¶ 12.)

12. Bastounes was one of the principal actors in the Film (Ex. N, Bastounes Decl. ¶ 9) and was the manager of Plaintiff through at least 2007 (Ex. P, Duggan Dep. 22:18-21).

13. The three individual investors in the Film were Duggan, Nardoni, and Bastounes. (Ex. O, Bastounes Dep. 18:6-14.) On or about February 7, 2006, the "Paul Duggan Trust" – through its trustee, Duggan – entered into a "Subscription Agreement" with Plaintiff, agreeing to invest in the Film. (Ex. N, Bastounes Decl. ¶ 5 and Ex. B thereto.) Nardoni was also an original investor in the Film. (Ex. O, Bastounes Dep. 18:1-14, 24:8-13.) Duggan and Nardoni each own a 40% interest in Merry Gentleman, LLC. (Ex. P, Duggan Dep. 24:13-25:24.)

14. Bastounes testified at his deposition on December 19, 2013 that Duggan and Nardoni, the two main investors in the Film, "were all savvy investors. Everybody was a big boy. Everybody knows movies are risky. I mean, that's part of the culture. And we moved

3

ahead." (Ex. O, Bastounes Dep. 32:14-33:4.) Nardoni passed away in August 2010. (*Id*. at 36:14-21.)

**B.     After the Director Becomes Sick, Plaintiff Hires Keaton to Direct the Film.**

15.     Ron Lazzeretti was director for the Film until December 2006, when he was diagnosed with a ruptured appendix. (Ex. Q, Lazzeretti Dep. 46:13-47:10, 52:20-53:12.) After Lazzeretti became ill in December 2006, he could not direct the Film. Keaton offered to direct the Film, and Duggan and Bastounes (the "Producers") agreed even though they knew Keaton had not previously directed a motion picture. (Ex. N, Bastounes Decl. ¶ 9.)

16.     Plaintiff Merry Gentleman, LLC and Keaton entered into the Directing Agreement dated February 1, 2007 (the "Directing Agreement"). (Ex. B, Directing Agreement; Hagale Decl. ¶ 2.)

17.     Under the Directing Agreement, Keaton agreed to "render all usual and customary services rendered by individual directors of first-class motion pictures" (¶ 1) in return for a fixed directing fee of $100,000 (¶ 2) and a "directed by" credit (¶ 3). (*Id*.)

18.     Paragraph 4.1 of the Directing Agreement states that Plaintiff and Keaton had "mutual[] approv[al]" rights, with Plaintiff holding the "tiebreaker" with respect to "the screenplay, locations, budgets, schedules, . . . [various cast and crew], music, laboratories (consultation only) and facilities . . . ." (*Id*.) Paragraph 4.2 provides that "[a]ll other business and creative decisions with respect to the Picture shall be at Company's sole discretion, including, without limitation, Company having final cut on the Picture." (*Id*.)

**C.     Participants in Filming and Post-Production Praise Keaton's Directing.**

19.     The Film was photographed, with Keaton directing, "in Chicago during March and April 2007." (Compl. ¶ 15; Amended Answer ¶ 15.)

4

20. Bastounes, one of the primary actors and investors in the Film, testified that "Mr. Keaton acted professionally and competently as the Director throughout the filming." (Ex. N, Bastounes Decl. ¶ 10.)

21. Ron Lazzeretti, who also served as a producer on the Film, was on set during principal photography and testified that "I very much liked what Michael was doing. I thought – I thought he was creating a style and a look for it that I really liked." (Ex. Q, Lazzeretti Dep. 71:21-72:1.) Lazzeretti liked Keaton's "energy and enthusiasm. I mean that's – And I felt like the crew was very much behind him. The production, by and large, was a great experience in that regard. And ultimately, a collaborative one." (*Id*. at 72:2-8.) Lazzeretti also felt Keaton did a "great job" as an actor. (*Id*. at 72:9-11.)

22. Grant Myers ("Myers"), one of the editors on the Film, testified at his deposition on November 8, 2013 that Keaton was involved in the editing process when post-production occurred in Montana and that Keaton provided him with direction every day. (Ex. R, Myers Dep. 144:6-145:8; Hagale Decl. ¶ 18.) Myers also testified that when editing moved from Montana back to Santa Monica, Keaton appropriately fulfilled his role as director. (*Id*. at 145:9-21.)

23. Myers rated Keaton's performance as a director "an A" and testified that Keaton performed "much better" than any other director with whom Myers has worked. (*Id*. at 146:2-17.)

24. Howard Smith ("Smith"), one of the editors on the Film, has extensive experience working with top directors in the film industry, including Kathryn Bigelow and James Foley (*At Close Range* and *Glengarry Glen Ross*). (Ex. S, Smith Dep. 13:23-18:17, 24:4-13; Hagale Decl. ¶ 19; Ex. T, Smith Dep. Ex. 36; Hagale Decl. ¶ 20).)

25. Smith testified at his deposition on November 9, 2013 that he worked very closely with Keaton during the editing process and that "[h]e was great. He's a terrific collaborator. He's incredible." (Ex. S, Smith Dep. 50:17-20.) Smith, who has worked with several first-time directors, rated Keaton "right at the top." (*Id*. at 51:1-3.) In describing Keaton's abilities as a director, Smith testified as follows:

> Michael's sense of cinema is very, very intense. And he's absolutely right. I mean, he's like – he's so clear about what it is he's trying to achieve, and he can so articulate it, that I have to rate him as one of – look, I have been very fortunate. I have worked with a lot of really great directors, directors who really are great filmmakers, and it's always a pleasure to work with these people, and Michael is definitely in that category.

(*Id*. at 51:14-22.)

**D.     The Film is Selected for Showing at the Prestigious Sundance Film Festival.**

26. The financing of independent films "involves a complex set of variables," including the subject matter, the budget, the commercial viability of the cast, the director, and the market conditions at the time that the project is introduced to potential buyers. (Ex. A, Expert Report of Daniel J. Rosett ("Rosett Report"), p. 8-12.)

27. The Film's Producers did not sell the rights to the Film before it was made and shown. (Ex. N, Bastounes Decl. ¶ 10.)

28. From the start, the Film's Producers planned to submit the Film to the Sundance Film Festival (Ex. P, Duggan Dep. 173:3-6), which Plaintiff's describe as "the largest and most prestigious independent film festival in the United States" (Compl. ¶ 32).

29. In the fall of 2007, Plaintiff – as planned – submitted the Film to the Sundance Film Festival for exhibition at the January 2008 Film Festival. (Compl. ¶ 32.)

30. Many independent films are submitted each year to the Sundance Film Festival, with very few selected. For the 2008 Festival, only about 3% of the more than 3,600 films

6

submitted (*i.e.*, 121 films) were selected for showing. (Ex. A, Rosett Report, pp. 14-15 and Appendix C thereto.)

31. The Film was accepted into the 2008 Sundance Film Festival and premiered on January 18, 2008 at the Eccles Theater, the Festival's largest theater. (Compl. ¶¶ 33, 49; Amended Answer ¶¶ 33, 49.)

32. *USA Today* identified 10 films "that stand out" at the 2008 Sundance Film Festival, including *Merry Gentleman*. (Compl. ¶ 49; Amended Answer ¶ 49.)

33. Bastounes attended the premiere of *Merry Gentleman* at the 2008 Sundance Film Festival and testified that the Film "was well received by those attending." (Ex. N, Bastounes Decl. ¶ 13.)

34. Smith attended the premiere of *Merry Gentleman* at the 2008 Sundance Film Festival and testified that the Film "was very well received." (Ex. S, Smith Dep. 72:11-14.)

35. The Film received a positive response from critics and audiences who saw the Film at Sundance, including high marks from Hollywood's two most respected trade publications, *The Hollywood Reporter* and *Variety*. (Ex. A, Rosett Report, p. 15.) Duane Byrge, a critic for *The Hollywood Reporter*, wrote: "An impressive directorial debut by Michael Keaton, the film enthralled a Sundance audience and should stir others." (*See* Ex. C, Byrge, *Review: The Merry Gentleman*, published on January 19, 2008; Hagale Decl. ¶ 3.) Todd McCarthy of *Variety* highlighted the Film's strong production values and was complimentary of Mr. Keaton's direction. (*See* Ex. D, McCarthy, *Review: The Merry Gentleman*, published on January 21, 2008; Hagale Decl. ¶ 4.)

36. Keaton participated in every press appearance requested of him at Sundance. (Ex. P, Duggan Dep. 157:23-158:3.)

7

37. Plaintiff hired one of the top talent agencies, Creative Artists Agency (CAA), to attempt to sell the Film's distribution rights at the 2008 Sundance Film Festival. (Ex. N, Bastounes Decl. ¶ 13.)

38. The market for independent films seeking theatrical distribution was highly selective during this time period, and numerous high-profile independent films either failed to receive distribution commitments or achieved very modest box office performance. (Ex. A, Rosett Report, p. 8 and Appendix B thereto.)

39. The market conditions at the 2008 Sundance Film Festival "can be characterized as competitive but cautious." No distributor acquired more than one film during the Festival itself, and many active specialty distributors did not buy any films at all, including Miramax, Picturehouse and Warner Independent. (*Id*. at 15.)

40. Several highly anticipated and publicized films shown at the 2008 Sundance Film Festival failed to sell at the Festival, including films featuring the well-known actors Robert DeNiro, Tom Hanks, John Malkovich and Amy Adams. (*Id*. at 14-15.)

41. Paul Duggan testified on March 4, 2014 as follows:

> Q: Okay. Let's break this down. What specifically did Mr. Keaton do at Sundance that prevented the movie from being sold? And I'm speaking specifically at Sundance.
>
> A: Nothing that I can speak to.

(Ex. P, Duggan Dep. 95:6-10.)

42. On February 4, 2008, Benjamin Kramer from CAA sent an email to Duggan and Bastounes attaching a "sales feedback grid" for *Merry Gentleman*, which memorializes CAA's communications with each of the potential distributors solicited by CAA in connection with the Film, provides any notes on the distributor's reaction to the Film, and states whether the

distributor decided to "Pass" or make an "Offer" (the "CAA Sales Feedback Grid"). (Ex. I, Duggan Dep. Ex. 112; Hagale Decl. ¶ 9.)

43. The CAA Sales Feedback Grid recorded the following comments, among others: (a) Dana Lambert at Autonomous Films – "Keaton did a great job. Too dark . . . ."; (b) Gary Hirsch at First Look Studios – "liked . . . Good performances . . . ."; (c) Dylan Wilcox at Focus Features – "Enjoyed it. The performances were good and I liked the character dynamics. Ultimately, it is too low key in nature and is a bit slow to make a big enough impact for them to distribute but a strong directorial debut from Keaton"; (d) Amy Beecroft at Greenestreet Films – "Liked, but not for them"; (e) Lara Thompson at Sony – "Lara liked a lot, but not sure how to market"; and (f) Dylan Leiner at Sony Pictures Classics – "Dylan liked, but the team was ultimately too split on it." (Ex. I, Duggan Dep. Ex. 112.)

44. The CAA Sales Feedback Grid listed five "Offers," from Bleiberg Entertainment, Fabrication Films, Lightning Entertainment, New Films, and The G-Machine. (*Id.*)

45. "The fact that the film did not sell to a domestic distributor during the festival can be attributed to a combination of objective and subjective factors, most notably adverse market conditions and the overall commercial viability of the script." (Ex. A, Rosett Report, p. 16.)

46. "There is nothing in the case materials or the public record to suggest that Mr. Keaton's performance as director or his appearances and interviews at the festival were viewed in anything other than a positive light." (*Id.*) Indeed, there is no evidence that any actions taken by Keaton at any time caused the film not to sell. (*Id.* at 14-16.) "It is not uncommon for producers and financiers who pursue a film festival strategy to ultimately fail to obtain a sale of domestic rights." (*Id.* at 11.)

9

E. **The Film *Merry Gentleman* was a Critical and Artistic Success.**

47. After Sundance, the Producers entered into distribution agreements with Samuel Goldwyn Films for domestic theatrical distribution, Genius Products for home video, and Lightning Entertainment for international distribution. (Ex. P, Duggan Dep. 69:5-8, 70:3-24, 161:12-14.)

48. It is customary for films that premiere at major film festivals to undergo editorial and music changes after the festival showing. (Ex. A, Rosett Report, p. 17.)

49. The Producers and Samuel Goldwyn Films requested that Keaton make changes to the Sundance cut of the Film, which he did. (Ex. N, Bastounes Decl. ¶ 13.)

50. The Film was released for theatrical distribution in May of 2009, a decision made by the Producers after being assured by their domestic distributor (Samuel Goldwyn Films) that it would not matter whether the Film was released in May or in December. (Ex. P, Duggan Dep. 107:9-17, 111:14-112:8.)

51. The Film received "substantial critical praise" from many sources, including the national film critic Roger Ebert, *The New York Times*, the *Los Angeles Times*, *Daily Variety*, and TV show host David Letterman, among others. (Compl. ¶ 53; Amended Answer ¶ 53; Ex. N, Bastounes Decl. ¶ 13.) Roger Ebert awarded the Film 3.5 out of 4 stars and called the Film "original, absorbing and curiously moving in ways that are far from expected." (Compl. ¶ 53; Amended Answer ¶ 53; Ex. E, Roger Ebert's review published on April 29, 2009; Hagale Decl. ¶ 5.) *The New York Times'* Manohla Dargis called the Film "[a]n austere, nearly perfect character study of two mismatched yet ideally matched souls." (Compl. ¶ 53; Ex. F, *The New York Times* review published on April 30, 2009; Hagale Decl. ¶ 6.) David Letterman said on his CBS show *Late Night with David Letterman*, "What a tremendous film …. I loved it." (Compl. ¶ 53; Amended Answer ¶ 53.) The *Los Angeles Times*'s Betsy Sharkey lauded "Michael Keaton's

10

impressive directing debut." (Ex. G, *Los Angeles Times* review published on May 1, 2009; Hagale Decl. ¶ 7.)

52. To promote the Film's release, Keaton appeared on CBS's *Late Night With David Letterman* and on ABC's *Good Morning America*. (Ex. A, Rosett Report, p. 19; Ex. N, Bastounes Decl. ¶ 14.)

53. The amount of nationwide publicity the Film received as a result of Keaton's appearances was unusual for a small-budgeted independent film. (Ex. A, Rosett Report, p. 19; Ex. N, Bastounes Decl. ¶ 14.)

54. Plaintiff cannot identify any director of a $5 million film who did more publicity than Keaton did for this Film. (Ex. P, Duggan Dep. 128:22-129:2.)

55. The relatively small amount of money spent by the Producers on print and advertising made it more likely the Film would not succeed at the box office. (Ex. A, Rosett Report, p. 19.)

56. Bastounes testified that "the Film did not do well at the box office, but it was not Mr. Keaton's fault." (Ex. N, Bastounes Decl. ¶ 14.)

57. Duggan testified on March 4, 2014 as follows:

> Q: Okay. And sitting here today, you don't know how much more money the film would have made at the box office if Mr. Keaton had not breached his directing agreement?
>
> A: Correct.

(Ex. P, Duggan Dep. 140:23-141:3.) When asked whether there was "[a]nyone specifically in the Sundance purchasing market that would have purchased the film if Mr. Keaton had not interfered in Merry Gentleman LLC's contractual rights," Duggan testified that "[w]e'll never know." (*Id.* at 143:2-8.)

11

58. Richard Guardian, a principal with Lightning Entertainment – the international distributor hired by Plaintiff in connection with the Film – sent an email on January 9, 2009 to the Producers regarding "THE MERRY GENTLEMAN, today's phone call," which stated in pertinent part:

> Thanks for the time today… I hope I was able to clarify some of your questions and to provide some explanations on things that may not have been clear. I'm sorry that the outlook is so dire. At the best of times, the independent film business is a high risk undertaking, and today's depressed marketplace and volatile landscape compound those risks exponentially. A sales agent or distributor can only try to mitigate and manage risk, but it is impossible to eliminate it. . . .
>
> With regards to THE MERRY GENTLEMAN, the frustration is that this is a good film. But as I said, good is not always enough. Story, target demographic, marketplace competition, cast … all these things come into play. Too often we see crap work and good films flounder … one needs only to look at the U.S. Box Office charts to see that. . . .

(Ex. J, Duggan Dep. Ex. 117; Hagale Decl. ¶ 10.)

59. On January 12, 2009, Duggan and Bastounes sent an email to Keaton regarding "If it ain't broke….." which stated in pertinent part:

> We considered all of your input and suggestions in good faith, but ultimately, the viewpoint of the distributor and the feedback from the screening audience was weighted very heavily in determining what changes and revisions were made to the picture. . . .
>
> Based on your participation we believe that the final cut of the film represents a collaboration of all of the parties to produce a picture that has maximum commercial prospects. . . .
>
> It is now time to finish the picture and let the marketplace express their appreciation of the picture. That being said, this is still your picture, Michael, and it is one that you can be justifiably proud about. You have put your heart and soul into this and it is now the time to be recognized for that effort.

(Ex. K, Keaton Dep. Ex. 95; Hagale Decl. ¶ 11.)

60. On May 20, 2009, shortly after the theatrical release of the Film, Duggan sent an email to a person who had seen the Film and was sending him comments. Duggan replied in pertinent part:

> The film is thoughtful adult fare, not for all, but good nevertheless. Top five critics in US love it. We need to keep it alive and show in many cities, but have to cost justify the roll out. A tough business decision.
>
> I sense we made a film that will be watched for years, but will not make us money. Such is life.

(Ex. H, Duggan Dep. Ex. 111; Hagale Decl. ¶ 8.)

61. Bastounes attended the deposition of Keaton and reviewed the deposition of other witnesses taken in this action, including Smith, Myers, Sharon Zurek, Lazzeretti and Duggan. Bastounes "do[es] not believe there is evidence to support [Plaintiff's] allegations in the Complaint" and "[his] review of the testimony confirms [his] belief that nothing Mr. Keaton did or did not do caused any harm or damage to [Plaintiff], its members, or the Film." (Ex. N, Bastounes Decl. ¶ 17.)

62. There is no evidence in the record that anything Keaton did or did not do as director of the Film caused the Film not to sell or underperform at the box office.

63. Plaintiff did not designate any expert witness in this action pursuant to Fed.R. Civ.P. 26(a)(2), nor did Plaintiff designate any rebuttal expert witness to respond to the Expert Report of Daniel J. Rosett submitted by Defendants on May 12, 2014.

F. **Most Independent Films Lose Money.**

64. "Most independent films lose money for the investors." (Ex. A, Rosett Report, p. 12.)

65. Plaintiff produced the Film "during a period in which the independent film marketplace was widely known to be a very high risk and low return business. A realistic

13

assessment of readily available data, as well as consultation with experienced industry advisors, would conclude that there was a high probability that the film would lose a substantial portion of its investment." (*Id*. at 8.)

66. Plaintiff failed to mitigate the risk associated with the Film, causing the Film to be even higher risk than is customary for independent films. (*Id*. at 8-9.) For example, Plaintiff "(a) did not appoint an international sales agent prior to completion of principal photography; (b) did not complete any pre-sale contracts with international distributors prior to completion of principal photography; and (c) did not utilize a film completion bond company during the production or post-production process." (*Id*.)

67. When a production company chooses to sell domestic or international distribution rights at a film festival there are "inherent risks because these film festivals create competitive environments and there are many other films being showcased at the same festival. Therefore, although a film might otherwise be critically well-reviewed and generally perceived to be of good quality, it may not achieve optimal sales results at the festival due to other competitive products being marketed in the same very short window." (*Id*. at 11.)

Dated: September 8, 2014              Respectfully submitted,

/s/ Christopher Hagale
Sidney Herman (# 3121807)
Hamilton Hill (# 6275123)
Christopher Hagale (# 6306085)
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street
Chicago, IL  60654
Telephone: (312) 494-4400

Michael J. Kump
Jeremiah Reynolds
KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 Wilshire Blvd., 3rd Floor
Santa Monica, CA 90401
Telephone:  (310) 566-9800

*Attorneys for Defendants and Counter-Claimants George and Leona Productions, Inc. and Michael Keaton*

## CERTIFICATE OF SERVICE

I, Christopher Hagale, an attorney, hereby certify that a true and correct copy of the foregoing document entitled **LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR BREACH OF CONTRACT** was electronically filed with the Clerk of the Court for the Northern District of Illinois using the CM/ECF System and emailed to counsel for Plaintiff listed below on September 8, 2014.

> Matthew D. Tanner
> Roeser Bucheit & Graham LLC
> Two N. Riverside Plaza, Suite 1420
> Chicago, IL  60606
> Telephone: (312) 300-2522
> mtanner@rbglegal.com
>
> *Attorney for Plaintiff Merry Gentleman, LLC*
> *and Third-Party Defendant Paul Duggan*

> /s/ Christopher Hagale
> Christopher Hagale (# 6306085)
> BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
> 54 West Hubbard Street
> Chicago, IL  60654
> Telephone: (312) 494-4400
> Facsimile:  (312) 494-4440
> chris.hagale@bartlit-beck.com
>
> *Attorney for Defendants and Counter-Claimants*
> *George and Leona Productions, Inc. and Michael*
> *Keaton*