UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MERRY GENTLEMAN, LLC, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | 13 C 2690 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| GEORGE AND LEONA PRODUCTIONS, INC., and MICHAEL KEATON, | ) ) | |
| | ) | |
| Defendants/Counter-Plaintiffs/ Third-Party Plaintiffs, | ) ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| PAUL DUGGAN, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Merry Gentleman, LLC, brought this suit against Michael Keaton and his loan-out company (together, "Keaton"), alleging breach of the parties' directing services contract for *The Merry Gentleman*, a film produced by Merry Gentleman and directed by Keaton. Doc. 1. The court denied Keaton's Rule 12(b)(6) motion to dismiss. Docs. 21-22 (reported at 2013 WL 4105578 (N.D. Ill. Aug. 14, 2013)). Keaton then answered, counterclaimed against Merry Gentleman for breach of contract, and asserted third-party claims for tortious interference with contract against Paul Duggan, Tom Bastounes, and Ron Lazzeretti for their alleged involvement in Merry Gentleman's alleged breaches. Doc. 24. Keaton later dropped Lazzeretti and Bastounes as third-party defendants, Docs. 46, 52-53, and Bastounes has since executed a declaration averring his belief that Merry Gentleman's claims against Keaton are meritless, Doc.

1

75-13 at 1-6.) The court recently denied Keaton's Rule 41 motion to dismiss Merry Gentleman's claim. Docs. 65-66 (reported at 2014 WL 3810998 (N.D. Ill. Aug. 1, 2014)).

Trial has been set for March 2, 2015. Doc. 61. Now before the court are three motions for summary judgment: Keaton's on Merry Gentleman's claim, Doc. 71; Merry Gentleman's on Keaton's counterclaim, Doc. 69; and Duggan's on Keaton's third-party claim, Doc. 67. Keaton's motion is granted, and the other two motions are entered and continued, though Keaton will be required under Rule 56(f) to show why summary judgment should not be granted on his counterclaim and third-party claim on the same ground on which he has prevailed on Merry Gentleman's claim.

## Background

Because only Keaton's summary judgment motion will be resolved here, the following facts are set forth as favorably to Merry Gentleman, the non-movant, as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012). That said, many of the facts are undisputed, either by agreement or because the fact simply reflects a historical account of what a person said or what a document states.

In 1997, in their first significant foray into the movie business, Lazzeretti and Bastounes produced and released *The Opera Lover*; the film was not a success, grossing less than $10,000 after opening in only two theaters. Doc. 79 at ¶¶ 6-7. Undeterred, Lazzeretti wrote another screenplay, this one for *The Merry Gentleman*. *Id.* at ¶ 6; Doc. 79-1 at 3, ¶ 1. Bastounes liked what he read, and so the two men arranged a luncheon to recruit potential investors for the film, which had an estimated budget of roughly $3 million. Doc. 79 at ¶ 8; Doc. 79-1 at 3. Duggan, a

hedge fund manager with no movie experience, was one of the invitees; he, along with Bastounes and another partner, eventually agreed to produce the film. Doc. 79 at ¶¶ 9-10, 13-14. To that end, they formed Merry Gentleman as an Illinois limited liability company in December 2004. *Id.* at ¶ 11.

Keaton was slated to star in the film and Lazzeretti to direct it; when Lazzeretti fell ill in December 2006, Keaton offered to step in and direct the film himself. *Id.* at ¶ 15. In February 2007, Merry Gentleman and Keaton executed a Directing Agreement, which set Keaton's compensation for his directing services at $100,000. *Id.* at ¶¶ 16-17. Filming ran from March to April 2007 in Chicago. *Id*. at ¶ 17. The Directing Agreement incorporated by reference the DGA (Director's Guild of America) Basic Agreement, which required Keaton to deliver a first cut of the film to Merry Gentleman six (ten, according to Keaton) weeks after the close of principal photography. Doc. 94 at ¶¶ 103-04. Keaton edited and assembled the film in California, delivering his first cut on August 2, 2007—nearly fifteen weeks after filming had closed and well after the deadline. *Id.* at ¶ 105. Dissatisfied with the first cut, Merry Gentleman began cutting its own version of the film (the parties call this the "Chicago Cut") on or about August 7, 2007, while Keaton continued to refine his "Director's Cut" in California. *Id.* at ¶ 109.

Merry Gentleman did not attempt to sell the rights to the film before it was made; instead, adopting a strategy with "inherent risks," Doc. 79 at ¶ 67, Merry Gentleman planned all along to submit the film to the Sundance Film Festival, "the largest and most prestigious independent film festival in the United States," in the hopes of selling it there, *id.* at ¶¶ 27-28. In Fall 2007, Merry Gentleman completed the film in time to submit it for the January 2008 festival. *Id.* at ¶ 29. Merry Gentleman chose to submit the Chicago Cut, not the Director's Cut, to Sundance. *Id*. at

¶ 29. Beating long odds, the film was one of only 121, out of more than 3,600 submissions, selected for screening at the festival. *Id.* at ¶¶ 30-31.

Section 12 of the Directing Agreement forbade Keaton from making "in any communication (whether written or oral) to any third party … any reference to [Merry Gentleman], the Screenplay, the Picture, this Agreement or any related matters." Doc. 94 at ¶ 114. Yet when Keaton learned of the Chicago Cut's submission to the festival, he informed Sundance's director that he would attend the festival only if his Director's Cut, not the Chicago Cut, were shown. *Id.* at ¶¶ 115-16. And so it was the Director's Cut, not the Chicago Cut, that ultimately premiered on January 18, 2008 at the Eccles Theater, the festival's largest venue. Doc. 79 at ¶ 31.

The film received positive reviews, including from *USA Today*, *The Hollywood Reporter*, and *Variety*; one critic called it "[a]n impressive directorial debut by" Keaton that "enthralled a Sundance audience and should stir others." *Id.* at ¶¶ 32-35. Under the Directing Agreement, Keaton was required "to render reasonable publicity and promotional services" for the film, Doc. 94 at ¶ 118, and he in fact "participated in every press appearance requested of him at Sundance," Doc. 79 at ¶ 36. Nevertheless, and although Merry Gentleman had hired a top talent agency, Creative Artists Agency, to attempt to sell the film's distribution rights at Sundance, the film failed to land a distribution deal at the festival. *Id.* at ¶¶ 37, 45. This was not unusual in the "highly selective" market for independent films that year; many films shown at Sundance that year, including movies starring Robert DeNiro, Tom Hanks, John Malkovich, and Amy Adams, also failed to sell at the festival. *Id.* at ¶¶ 38-40. Duggan—who is among Merry Gentleman's members and principal investors and who, according to Merry Gentleman and Duggan himself, now exercises full control over Merry Gentleman and directs its efforts in this litigation, Doc. 58

4

at 5; Doc. 58-1 at 7-9—admitted that he knew of nothing that Keaton did at Sundance that prevented the film from being sold. Doc. 79 at ¶ 41.

After Sundance, Merry Gentleman eventually found domestic, international, and home video distributors. *Id.* at ¶ 47. As is customary, both Keaton and Merry Gentleman made further changes to the film, which was released in May 2009 to generally positive reviews, including from Roger Ebert, the *New York Times*, and the *Los Angeles Times*. *Id.* at ¶¶ 48-51. Some critics, though, found the movie rather plodding and dull. Doc. 94 at ¶ 123. Merry Gentleman had agreed to the May release date after being assured by the film's domestic distributor (Samuel Goldwyn Films) that it would not matter whether the released occurred in May or December. Doc. 79 at ¶ 50.

To promote the film, Keaton appeared on *Late Night with David Letterman* and *Good Morning America*, though his behavior on those shows was somewhat odd and unenthusiastic. *Id*. at ¶ 52; Doc. 94 at ¶¶ 119-20. Nevertheless, Keaton drummed up an unusual amount of nationwide publicity for a low-budget independent film, and Duggan could not name any director of such a film who had generated more publicity than Keaton had for *The Merry Gentleman*. Doc. 79 at ¶¶ 53-54. Bastounes and Lazzeretti, along with the film's editors, uniformly praised Keaton's directorial work. *Id*. at ¶¶ 20-25, 56.

For all that, financial success did not follow. Although Merry Gentleman ultimately spent more than $5 million to produce the film, it fared poorly at the box office. Doc. 94 at ¶ 121. The financing of independent films involves a complex set of variables, including the subject matter, the budget, the cast's commercial viability, the director, and the market conditions at the time the film is introduced to potential buyers. Doc. 79 at ¶ 26. Duggan does not know how much more money the film would have made at the box office had Keaton not

5

(allegedly) breached the Directing Agreement. *Id*. at ¶ 57. Shortly after the film's release, Duggan sent an email saying: "The film is thoughtful adult fare, not for all, but good nevertheless. Top five critics in US love it. … I sense we made a film that will be watched for years, but will not make us money. Such is life." *Id*. at ¶ 60.

**Discussion**

I. **Keaton's Summary Judgment Motion**

Illinois law governs the Directing Agreement. Doc. 75-1 at 15, § 17. "Under Illinois law, a plaintiff asserting a breach of contract claim 'must plead and prove: (1) the existence of a contract, (2) the performance of its conditions by the plaintiff, (3) a breach by the defendant, and (4) damages as a result of the breach.'" *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 626 (7th Cir. 2013) (quoting *Law Offices of Colleen M. McLaughlin v. First Star Fin. Corp.*, 963 N.E.2d 968, 981 (Ill. App. 2011)). Keaton's summary judgment motion focuses exclusively on the fourth element, arguing that Merry Gentleman cannot prove that his alleged breaches of the Directing Agreement caused Merry Gentleman to suffer any damages. Doc. 72 at 10-17. On the summary judgment record, and considering the arguments Merry Gentleman has made in opposing summary judgment, Keaton is correct.

"A party injured by another's breach or repudiation of a contract usually seeks recovery in the form of damages based on his 'expectation interest,' which involves obtaining the 'benefit of the bargain,' or his 'reliance interest,' which involves reimbursement for loss caused by reliance on a contract." *MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 845 N.E.2d 22, 30 (Ill. App. 2006) (quoting *Restatement (Second) of Contracts*, § 344 (1981)). Merry Gentleman's Rule 26(a)(1) disclosure articulates both damage theories. Doc. 75-12. As for expectation damages, the disclosure states that Merry Gentleman would seek the $4 million for

6

which it believed the film would have sold at Sundance but for Keaton's breaches. *Id.* at 3. Merry Gentleman's opposition brief, however, declines to defend its expectation damage theory. Doc. 78 at 5. Merry Gentleman accordingly has forfeited any dependence on that theory. *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 407 (7th Cir. 2007) ("We agree with the district court's determination that [the plaintiff] waived (forfeited would be the better term) his discrimination claim by devoting only a skeletal argument in response to [the defendant's] motion for summary judgment."), *aff'd*, 553 U.S. 442 (2008); *Domka v. Portage Cnty.*, 523 F.3d 776, 783 (7th Cir. 2006) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.") (internal quotation marks omitted).

As for reliance damages, Merry Gentleman's disclosure states that it would seek the $5.5 million it spent "in performing its contractual obligations, money it would not have invested had it been aware that [Keaton] would violate the terms of [the Directing Agreement]." Doc. 75-12 at 3. "The underlying principle in reliance damages is that a party who relies on another party's promise made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise." *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1382 (Fed. Cir. 2001) (citing *Restatement (Second) of Contracts*, *supra*, § 344(b)). "The purpose behind reliance damages is to reimburse the injured party so that he is put in 'as good a position as he would have been in had the contract not been made.'" *Designer Direct, Inc. v. DeForest Redevelopment Auth.*, 313 F.3d 1036, 1049 (7th Cir. 2002) (quoting *Restatement (Second) of Contracts*, *supra*, § 344).

Keaton's initial brief contends that Merry Gentleman's reliance damage theory fails because Merry Gentleman cannot show that his alleged breaches of the Directing Agreement

7

caused it to suffer damages.* Doc. 72 at 10-15. When it finally gets to causation, Merry Gentleman's opposition brief says essentially three things. The first is that reliance damages are available under Illinois law. Doc. 78 at 5-6. That much is beyond dispute. The second is that Merry Gentleman "incurred millions of dollars in expenses" and that "it incurred those expenses in performance of the contract." *Id*. at 6. That is beyond dispute as well, at least for purposes of summary judgment. The third thing Merry Gentleman says is that "[c]ausation is not an impediment to plaintiff's ability to seek a recovery" because, "[e]ven accepting Keaton's position on the inherent inability of a litigant to demonstrate with reasonable certainty that preparing the film in a different way or in a different time-frame would have led to a measurably different result, under a reliance theory the causation prong is satisfied when the plaintiff demonstrates 'both that it incurred those expenditures and that it incurred them in preparation for performance or in performance.'" *Id*. at 6-7 (quoting *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 154 (2002)). Put another way, Merry Gentleman submits that to show causation under a reliance damage theory, all a plaintiff needs to prove is that it incurred certain

---

* Merry Gentleman maintains that Keaton's initial brief addressed only expectation damages and not reliance damages. Doc. 78 at 2-3, 5. That is incorrect, as Keaton expressly argued that Merry Gentleman could not establish the causation element of its contract claim under either an expectation damage theory or a reliance damage theory. Doc. 72 at 11 ("Whatever theory of damages Plaintiff proffers, Plaintiff is unable to produce any evidence to … establish causation …."), 12 ("Under any damage theory, Plaintiff must prove by a preponderance of the evidence that Keaton's actions in his role as director of the Film caused the damages Plaintiff now seeks to recover. Thus, Plaintiff must come forward with admissible evidence establishing that Keaton's actions as director (1) caused potential distributors not to purchase the Film and (2) caused the Film to underperform financially."). At oral argument on the summary judgment motions, Merry Gentleman noted that Keaton waited until his reply brief to argue that reliance damages are not permitted because they were not reasonably foreseeable at the time of contracting. Merry Gentleman is right in *that* respect, and the court will not consider Keaton's tardy foreseeability argument in resolving his summary judgment motion. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("the district court is entitled to find that an argument raised for the first time in a reply brief is forfeited").

8

expenditures and that it incurred those expenditures while performing the contract. *Id*. at 7 (quoting *Slattery v. United States*, 69 Fed. Cl. 573, 577 (2006), *rev'd in part on other grounds*, 583 F.3d 800 (Fed. Cir. 2009), *as modified*, 635 F.3d 1298 (Fed Cir. 2011), for the proposition that, "[i]n the context of reliance damages, causation refers to Plaintiff's burden [of] showing that its … expenditures were incurred as a result of the contract") (ellipses in original)).

Merry Gentleman's understanding of causation cannot be reconciled with prevailing case law. (As do the parties, the court relies in substantial part on decisions issued by the Court of Federal Claims and the Court of Appeals for the Federal Circuit; those courts have a well-developed jurisprudence on reliance damages, an issue that appears to arise frequently in the government contracting cases heard by those courts.) The *Westfed* opinion on which Merry Gentleman relies, in addition to saying (as Merry Gentleman emphasizes) that a plaintiff seeking reliance damages "must prove both that it incurred those expenditures and that it incurred them in preparation for performance or in performance," 52 Fed. Cl. at 154, goes on to say: "The value of the expenditures must have been lost *as a result of the breach*," *id.* at 161 (emphasis added). Likewise, the *Slattery* opinion on which Merry Gentleman relies, in addition to saying (as Merry Gentleman emphasizes) that "[i]n the context of reliance damages, causation refers to Plaintiff's burden [of] showing that its … expenditures were incurred as a result of the contract," 69 Fed. Cl. at 577, also says that "reliance damages must be … *caused by the breach*," *id*. at 577 (emphasis added). The Seventh Circuit likewise has held that when computing reliance damages, if the plaintiff "has not lost [his expenditures] *as a result of the breach*[, then] they should not be figured in his damages." *Autotrol Corp. v. Cont'l Water Sys. Corp.*, 918 F.2d 689, 694 (7th Cir. 1990) (emphasis added). And as noted above, "[t]o prevail on a breach of contract claim, a plaintiff must establish the existence of a valid and enforceable contract, plaintiff's

9

performance, defendant's breach of the terms of the contract, and damages *resulting from the breach*." *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014) (emphasis added).

Merry Gentleman cites nothing to support its position that the causation requirement—the requirement of an ascertainable connection between the nature and extent of the breach, on the one hand, and the degree of damages, on the other—evaporates just because the plaintiff pursues a reliance damage theory rather than an expectation damage theory. To the contrary, as just noted, the two cases it cites on the point, *Westfed* and *Slattery*, confirm the need for such a connection. So do other cases decided by the Federal Circuit and Court of Federal Claims. *See*, *e.g.*, *Old Stone Corp. v. United States*, 450 F.3d 1360, 1375 (Fed. Cir. 2006) (in discussing reliance damages, holding that "the damages must have been … proximately caused by the breach"); *Glendale Fed. Bank*, 239 F.3d at 1382 (holding that "[t]he underlying principle in reliance damages is that [the plaintiff] is entitled to damages for any *losses actually sustained as a result of the breach of that promise*") (emphasis added); *Chevron U.S.A., Inc. v. United States*, 116 Fed. Cl. 202, 208 (2014) ("[t]o demonstrate entitlement to reliance damages, a plaintiff must proffer evidence that … *the breach is a substantial causal factor in the damages*") (emphasis added).

The causal link between reliance damages and the breach will often be obvious—for a plaintiff ordinarily seeks reliance damages where the defendant repudiated the contract and walked away from the deal, leaving the non-breaching plaintiff holding the bag after having made its expenditures. That, at least, was true in every case Merry Gentleman cites in its brief. *See MC Baldwin Fin.*, 845 N.E.2d at 33 ("DiMaggio thereafter repudiated the contract before performing all of its obligations."); *Herbert W. Jaeger & Assocs. v. Slovak Am. Charitable Ass'n*,

10

507 N.E.2d 863, 868 (Ill. App. 1987) ("Here, the building was never completed, and the record contains no reasonably reliable estimate of the cost of completion as originally designed."); *Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F.3d 236, 240 (D.C. Cir. 1995) (where the defendant "repudiated the refinancing agreement"); *Westfed Holdings*, 52 Fed. Cl. at 140 (where the federal statute abolishing the Federal Home Loan Bank Board and establishing new capital requirements effectively repudiated a forbearance letter that the Board had previously issued to the plaintiff exempting it from the old capital requirements); *Slattery*, 69 Fed. Cl. at 576 (where the FDIC allegedly repudiated a 1982 memorandum of understanding by increasing the plaintiff's capital requirements in 1991). It is also true in every case the court has found in its own research, as well as in every example provided in the commentary to *Restatement (Third) of Restitution*, § 38 cmts. b, c, Illustrations (1)-(16) (1981).

The absence of any cases allowing reliance damages absent repudiation may suggest a rule that full reliance damages, which are what Merry Gentleman seeks, are in fact unavailable absent repudiation. But even if that were not the rule, and even if full reliance damages could possibly be proper absent repudiation, Merry Gentleman has done nothing to explain how its requested reliance damages are proper here. On Merry Gentleman's understanding of the causation requirement—where it need prove only its expenditures on the film and Keaton's breach of the Directing Agreement—it can recover the whole $5.5 million from Keaton regardless of the severity or extent of his alleged breaches. And likewise from Kelly Macdonald, the female lead, had she breached her acting services contract in any manner, significant or not. Or for that matter from the caterer, had it breached the food services contract by delivering lunch to the set an hour late one day.

Lacking any requirement of some ascertainable and quantifiable connection between Keaton's alleged breach and its recoverable damages, Merry Gentleman's causation theory would in effect, and contrary to settled law, render contract damages a penalty on the breaching party rather than compensation to the non-breaching party. That would run contrary to settled law, as "[t]he sole purpose of contract damages is to compensate the nonbreaching party, and punitive damages are not available even for a 'wilful' breach of contract." *Morrow v. L.A. Goldschmidt Assocs., Inc.*, 492 N.E.2d 181, 183 (Ill. 1986); *see also XCO Int'l Inc. v. Pac. Sci. Co.*, 369 F.3d 998, 1004 (7th Cir. 2004) ("if a contract provides that breaches of different gravity shall be sanctioned with equal severity, it is highly likely that the sanction specified for the mildest breach is a penalty"); *Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1290 (7th Cir. 1985) ("Mindful that Illinois courts resolve doubtful cases in favor of classification as a penalty, we conclude that the damage formula in this case is a penalty and not a liquidation of damages, because it is designed always to assure Lake River more than its actual damages. The formula—full contract price minus the amount already invoiced to Carborundum—is invariant to the gravity of the breach.") (citations omitted); E. Allan Farnsworth, "Legal Remedies for Breach of Contract," 70 *Colum. L. Rev.* 1145, 1177-78 (1970) ("Although $300,000 would be required to put Builder in the position in which he would have been had he not made the contract with Owner, no court would allow him this larger sum [as reliance damages]."). Merry Gentleman's bid for $5.5 million—as damages for Keaton's breaches of a $100,000 directing services agreement that, even viewing the facts in the light most favorable to Merry Gentleman, fall far short of repudiation—"is within the gravitational field of" cases disallowing as penalties contractual remedies that are causally untethered from the actual breaches. *Lake River Corp.*, 769 F.2d at 1290.

12

To forestall summary judgment, then, Merry Gentleman must show that a reasonable jury could find a causal connection between the nature of Keaton's alleged breaches and Merry Gentleman's claimed monetary losses. The problem is that Merry Gentleman does not even attempt to make such a showing. The closest Merry Gentleman comes is its drive-by, one-sentence argument that Keaton's alleged breaches caused damages "in that it was unable to screen and market the film of its choosing" and "in that it endured substantial additional costs." Doc. 78 at 4. That argument is unsupported by any citation to the parties' Local Rule 56.1 statements and responses—let alone to raw record materials, although even that would have been insufficient, *see Thorncreek Apartments III, LLC v. Vill. of Park Forest*, 970 F. Supp. 2d 828, 838-39 (N.D. Ill. 2013) (citing cases)—and thus is ignored. *See Greer v. Bd. of Educ. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001) (affirming summary judgment where the non-movant "did not cite any evidence in support of his pleadings" and included a "mass of information (none of which was referenced in his Rule 56.1 statement) … in the hope of avoiding summary judgment"); *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997) (holding that "we do not consider [the non-movant's] additional facts that are not supported by" "appropriate citations to the record").

Even putting aside that fatal flaw, Merry Gentleman's argument is wholly undeveloped and thus forfeited. *See Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) ("[A]s the district court found, the musical diversity argument was forfeited because it was perfunctory and underdeveloped."); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("We have made clear in the past that it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and we have warned that perfunctory and undeveloped arguments, and arguments that are unsupported by

13

pertinent authority, are waived.") (internal quotation marks and alterations omitted); *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 528 (7th Cir. 2005) ("[B]ecause Harper failed to properly present the issue to the district court in response to Vigilant's motion for summary judgment, that issue is waived."). *What* "additional costs"? Merry Gentleman does not say. *How* was the film that Keaton delivered to Merry Gentleman different from the film "of its choosing," and *how* did Keaton's alleged breaches account for the difference? Again, Merry Gentleman does not say. Granted, it might have been difficult for Merry Gentleman to say. It is undisputed that Keaton actually finished the film and that it was selected by the prestigious Sundance Film Festival, was shown at the festival's largest venue, and received critical praise and nationwide publicity unusual for such a film. While Keaton allegedly took too long to finish the first cut, he did finish it; and while he allegedly should not have insisted on his Director's Cut's being shown at Sundance, his cut received positive reviews, and he appeared at the festival and made all required publicity appearances; and while he allegedly should have been more enthusiastic and engaged in his television appearances, he did make the appearances and, by Duggan's own admission, he worked harder to publicize the film than any other director of a comparably sized film. And Duggan, the driving force behind Merry Gentleman's suit, further admitted that "[t]he film is thoughtful adult fare, not for all, but good nevertheless" and that the "[t]op five critics in [the United States love it," but that "we made a film that will be watched for years, but will not make us money" and that "[s]uch is life." Doc. 79 at ¶ 60. It might have been possible for Merry Gentleman to overcome these facts and avoid summary judgment by explaining how a reasonable jury could find that Keaton's alleged breaches caused it to incur "additional costs" and caused the film that Keaton delivered to Merry Gentleman to be different from the film "of

14

its choosing." But Merry Gentleman does not even try, and thus cannot forestall summary judgment on these grounds.

Merry Gentleman follows up with the assertion that Keaton's alleged breaches caused damages "in that in reliance on its expectation that Keaton would satisfy his contractual obligations, it spent millions of dollars to finance Keaton's temper tantrum, money it never would have expended if it had been aware of Keaton's unwillingness to conform his behavior to his contractual obligations." Doc. 78 at 4. That simply restates in a factual guise Merry Gentleman's maximalist legal argument that it can recover all of its expenditures on a reliance theory simply by showing that that it incurred certain expenditures while performing the Directing Agreement. That argument is wrong for the reasons stated above. It also proves too much. "We never would have signed the contract had we known the other side would breach" is true in *every* contractual dispute, and cannot entitle every non-breaching party to recover all of its expenditures.

In seeking $5.5 million in reliance damages, Merry Gentleman effectively wants to shift the entire cost—and risk—of producing *The Merry Gentleman* to Keaton for his alleged breaches, giving it a windfall and placing it in a *better* position than it would have been in had the contract never been signed. That is impermissible: "When a party who cannot prove expectation damages seeks instead to recover unreimbursed expenditures in reliance on the contract, it is an accepted rule that the award of damages may not shift to the defendant losses that the plaintiff would have realized on full performance." *Restatement (Third) of Restitution*, *supra*, § 38 cmt. d; *see also* L.L. Fuller & William R. Perdue, Jr., "The Reliance Interest in Contract Damages: 1," 46 *Yale L.J.* 52, 79 (1936) ("We will not in a suit for reimbursement for losses incurred in reliance on a contract knowingly put the plaintiff in a better position than he

15

would have occupied had the contract been fully performed.") (emphasis removed). Merry Gentleman paid $5.5 million for a movie, and it got a movie—by most accounts, including Duggan's, a very good one. That Merry Gentleman eventually lost money in the endeavor is unfortunate, but not justification to shift all of the losses to Keaton for alleged breaches that Merry Gentleman cannot prove caused those losses.

## II.     Merry Gentleman's and Duggan's Summary Judgment Motions

Merry Gentleman has moved for summary judgment on Keaton's counterclaim, which alleges that Merry Gentleman breached the Directing Agreement in several ways, including by failing to provide him with a list of qualified editors, by not providing a recruited audience screening of the film, and by "cutting behind" him—that is, by starting work on the Chicago Cut before he delivered his first cut. Doc. 46 at 17, ¶ 23; Doc. 86 at 7-8. Merry Gentleman's sole argument for summary judgment is that the record evidence does not support these and other allegations of breach. Doc. 69 at 2-4. Merry Gentleman's argument probably is wrong, but the point may be immaterial because Keaton's counterclaim likely fails on a ground that Merry Gentleman did *not* raise—the same ground on which Keaton has been granted summary judgment on Merry Gentleman's claim—namely, Keaton's inability to show that any of Merry Gentleman's breaches caused *him* to suffer damages. How, after all, did Keaton suffer monetarily from Merry Gentleman's (alleged) decision to "cut behind" him? How did the failure to provide Keaton with a recruited audience screening harm him monetarily?

It would be an understatement to say that answers to these questions do not immediately spring to mind. Indeed, at oral argument on the summary judgment motions, Keaton's attorney acknowledged that victory on his summary judgment motion could very well defeat his counterclaim: "We agree with all of the legal [arguments] we make in our summary judgment

16

[motion]. If those were applied to our counterclaims, they may be dispositive of those claims, but we filed those counterclaims out of an abundance of caution. … And what's good for the goose may be good for the gander, but we filed [the counterclaim] out of an abundance of caution." Keaton will not be held to his attorney's answer, for it was given to a question that he might not have expected regarding an issue that had not been raised in the briefs on Merry Gentleman's motion. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Mead Johnson & Co. LLC*, 735 F.3d 539, 545 (7th Cir. 2013) ("But we hesitate to base a decision on a concession made in the heat of oral argument under a barrage by the judges."). That said, it is difficult to imagine that Keaton could plausibly have given a different answer.

Duggan's sole argument for summary judgment on Keaton's tortious interference third-party claim rests on the statute of limitations. Doc. 67 at 2-3. That particular argument may or may not be right, but as with Keaton's counterclaim, the third-party claim likely fails on the ground that Duggan did not raise, which is that Keaton cannot prove the causation or damage elements of tortious interference. *See HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989) ("the elements of this tort are (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages") (internal quotation marks omitted).

Rule 56(f) allows a district court, "[a]fter giving notice and a reasonable time to respond," to grant summary judgment "on grounds not raised by a party." Fed. R. Civ. P. 56(f)(2). Keaton is hereby informed that the court believes that Merry Gentleman and Duggan may be entitled to summary judgment on the counterclaim and third-party claim on the ground

that Keaton cannot establish causation and damages. If Keaton disagrees, he has until January 7, 2015 to file a brief explaining how, consistent with the court's ruling on *his* summary judgment motion, a reasonable jury could find that he established causation and damages. If Keaton files such a brief, Merry Gentleman and Duggan may, together or separately, file a response brief by January 21, 2015.

## Conclusion

Keaton's summary judgment motion is granted, entitling Keaton to judgment on Merry Gentleman's claim. Merry Gentleman's and Duggan's motions for summary judgment as to Keaton's counterclaim and third-party claim are entered and continued, and Rule 56(f) briefing shall proceed as directed above.

December 22, 2014

_____
United States District Judge